**Nikiforos ZERVOS, Plaintiff,**

v.

**S.S. SAM HOUSTON and Waterman Steamship Corp., Defendants.**

**No. 75 Civ. 5293(HFW).**

United States District Court,
S. D. New York.

Dec. 7, 1976.

Haight, Gardner, Poor & Havens, New York City, by R. Glenn Bauer, New York City, of counsel, for Waterman Steamship Corp.

Kelley Drye & Warren, New York City, by Richard J. Concannon, Patricia A. Martone, New York City, of counsel, for Continental Bank International.

Graubard Moskovitz McGoldrick Dannett & Horowitz, New York City, by Jack Weinberg, Remy J. Ferrario, New York City, of counsel, for Addis Ababa Bank, National Bank of Ethiopia and Solomat, P.L.C.

Shedd Moraites & Rathe, New York City, by John C. Mamoulakis, New York City, of counsel, for Nikiforos Zervos.

David M. Berenson, New York City, for Marine Midland Bank of New York.

Kirlin, Campbell & Keating, New York City, by J. Scot Provan, New York City, of counsel, for Koninklijke Nedlloyd, b.v.

Cole & Deitz, New York City, by Albred D. Jordan, New York City, of counsel, for Van Ekris & Stoett, Inc.

Graubard Moskovitz McGoldrick, Dannett & Horowitz, New York City, by Jack Weinberg, Edward S. Weltman, New York City, of counsel, for Addis Ababa Bank, National Bank of Ethiopia and Solomat, P.L.C.

## OPINION

WERKER, District Judge.

### STATEMENT OF FACTS

This is a suit to determine the right of the parties to the proceeds of 150 tons of Djimmah coffee, each shipment of 75 tons each of which was shipped from Ethiopia to the ports of New York and New Orleans.

The motion before the court is a motion by Waterman Steamship Corporation ("Waterman") for summary judgment against Continental Bank International ("CBI"). Judgment is sought for freight charges in the amount of $6,619.92, demurrage in the amount of $7,590.25 and disbursements in the amount of $298.26 incurred in the defense of this action. Waterman seeks this amount under two agreements variously called guarantees or indemnities dated October 22, 1975 issued by CBI (the "CBI Agreements"). The mo-

tion is opposed by Addis Ababa Bank ("Addis Bank"), National Bank of Ethiopia, Solomat, P.L.C. ("Solomat") (hereinafter collectively referred to as the "Ethiopian parties"), and CBI.

Waterman is a carrier of goods by sea which maintains an agent in Addis Ababa, Ethiopia by the name of Gellatly Hankey & Co. (Eth) S.C. ("Gellatly"). Among other services it provides, Waterman carries cargoes of coffee from Ethiopia to United States ports.

Solomat, an Ethiopian corporation, had borrowed funds from Addis Bank in July 1975 for the purchase of 600 metric tons of coffee for export, some 450 of which were bound for San Francisco and which are not at issue here. Pursuant to the financing arrangement Solomat had with Addis Bank, bills of lading were to be negotiated and delivered to Addis Bank to secure the repayment of loans by Solomat. Seventy-five metric tons were destined for New York, and another seventy-five tons were bound for New Orleans. A contract had been entered by Solomon Mahteme Selassie ("Solomon"), Solomat's general manager, with Van Ekris & Stoett, Inc. ("Van Ekris") for the purchase of 500 tons of coffee, 75 tons of which were destined for New York. Payment for the New York shipment was to be made by Van Ekris by means of a letter of credit in favor of Addis issued by Marine Midland Bank ("Marine Midland") at Van Ekris's request. Another contract had been entered under which Solomon agreed to sell and Lonray, Inc. ("Lonray") agreed to buy 75 metric tons of coffee destined for New Orleans. Payment for this shipment was to be made through a letter of credit issued by First National City Bank ("Citibank") at the instance of Lonray.

Gellatly received two written shipping instructions from Solomat on or about August 20 or 21, 1975, one of which was to cover the New York shipment of coffee aboard the S.S. Sam Houston, a Waterman vessel, the other of which was to cover the New Orleans shipment. The shipping instructions for the New York shipment requested

that a bill of lading naming Solomon as shipper, the consignee as "order" and the notify party as "Van Ekris & Stoett, Inc." be issued. The shipping instructions for the New Orleans shipment requested the issuance of a bill of lading naming Solomat as shipper, the consignee as "order" and the notify party as Lonray. In accordance with the shipping instructions, Gellatly issued two bills of lading. The bill of lading for the New York shipment was designated No. 1 and the bill of lading covering the New Orleans shipment was designated No. 2. Solomon, on or about August 26, 1975, took bills of lading Nos. 1 and 2, which the Ethiopian parties allege were the property of Solomat and fled Ethiopia.

On September 3, 1975, Gellatly received notice of the alleged theft of bills of lading Nos. 1 and 2 and was simultaneously requested to issue fresh bills of lading for both shipments. In a letter dated September 5, 1975, Addis Bank wrote Gellatly indicating that it would hold Gellatly "harmless and indemnified against any liabilities, claims, risk and damages which you may sustain consequent upon your taking action on the basis of this letter." The letter elsewhere requested Gellatly's assistance in preventing Solomon from negotiating the two bills of lading. The letter further indicated that "If you later on deem it necessary, we can make arrangements to back our guarantee via our international correspondent banks in London and New York." Waterman by telex dated September 5, 1975 stated that it would issue duplicate original bills of lading against the shipper's guarantee endorsed by the bank. No mention was made in Waterman's responsive telex of a correspondent bank backing such a guarantee.

On September 16, 1975 Addis Bank gave Gellatly two letters of indemnity, the "Addis Agreements," to cover Waterman and its agents upon the issuance of duplicate originals. Gellatly delivered the requested duplicate original bills of lading to Solomat on September 17, 1975. The numbers affixed to the duplicate original New York and New Orleans bills of lading were Nos.

11 and 14 respectively. One day later Addis Bank advised Van Ekris to clear the goods against payment since a replacement bill of lading for the New York shipment had been obtained.

The Sam Houston arrived in New York on or before September 20, 1975 [1] and discharged its New York shipment.

On September 22, 1975, the United Overseas Bank of Geneva advised that it was holding bill of lading No. 2. The following day, Waterman received notice from an international freight forwarder named Natural, Nydegger Transport Corporation that it was holding bill of lading No. 1. Thereupon Waterman telexed Gellatly and requested that it instruct Addis Bank and the shipper not to negotiate bills of lading Nos. 11 and 14. Waterman also stated that it would now require the posting of a bond with a United States bonding company or the opening up of a letter of credit with a major United States bank and that failing the posting of this additional security that it would require the return of bills of lading Nos. 11 and 14.

On September 25, 1975, Waterman received a telex from the plaintiff, Nikiforos Zervos ("Zervos") stating that he was in possession of bill of lading No. 1. Thereupon Waterman sent a telex directly to Addis Bank advising it of the Zervos telex and threatening the bank with suit in a United States court unless it returned bills of lading Nos. 11 and 14 and posted the United States security. Negotiations amongst Waterman, CBI and Addis Bank ensued over the issue of United States security.

In the meantime on September 24, 1975 Marine Midland had received from Addis Bank a delivery package including bill of lading No. 11, and on or about October 2, 1975, it added its endorsement to the bill of lading and delivered it to Van Ekris, indicating that it was releasing the bill of lading free of payment so that Van Ekris could obtain clearance of the shipment of coffee. On the same day, Van Ekris added its endorsement to bill of lading No. 11 and then delivered it fully endorsed to Waterman. Van Ekris presented at the same time a delivery order requesting delivery of the New York shipment to its customer, Hills Bros. Coffee, Inc. ("Hills Bros."). Waterman accepted the fully endorsed bill of lading No. 11 and a check from Hills Bros. covering freight but refused to deliver the New York shipment.

Later, Zervos appeared at the Waterman office to tender freight monies and demand delivery of the New York shipment. One day after this, on October 22, 1975, CBI issued the two agreements which were signed by a representative of Addis Bank as well. Upon the execution of the CBI Agreements, Waterman then returned to Zervos the check he had tendered for the freight on the two shipments. In the meantime, however, Van Ekris now refused to take delivery of the New York shipment.[2] This litigation was begun on October 24, 1975. In an order signed December 17, 1975, the court directed that the coffee constituting the New York shipment be sold at auction to the highest bidder. Numerous cross-claims and counterclaims by the various parties have been filed.[3]

---

**1.** The Ethiopian parties suggest this might have taken place at an earlier date.

**2.** By contrast, Lonray took delivery of the New Orleans shipment and also paid the freight charge on it.

**3.** These claims may be summarized as follows: In the main complaint Zervos stated a cause of action against Waterman for conversion on account of Waterman's failure to convey the New York shipment upon his presentation of the original set of bills of lading covering that shipment. In its answer, Waterman interpleaded CBI, the Ethiopian parties, Van Ekris and

Lonray with respect to the entitlement of the parties to the proceeds of the coffee. The Ethiopian parties thereafter counterclaimed against Waterman for its improper issuance of the bill of lading and other allegedly improper conduct and added Solomon as counterclaim defendant. They also raised cross-claims against Marine Midland and Van Ekris because payments were not made to Addis Bank under the letter of credit issued at the instance of Van Ekris by Marine Midland and because Van Ekris refused to ultimately accept delivery. In addition, the Ethiopian parties cross-claimed against Citibank and Lonray for failure of Citibank to pay pursuant to its letter of credit and for failure of

I conclude that the CBI Agreements were issued without consideration and that therefore Waterman is not entitled to summary judgment based on its claim under the CBI Agreements.

The consideration offered by Waterman for the CBI Agreements was identical to that offered by it for the Addis Agreements. Each of the Addis Agreements contained the following language:

> On or about 20th August, 1975, your office issued [bills of lading Nos. 1 and 2 respectively].
>
> The original bills of lading have either been lost or destroyed and, therefore, we request that three new negotiable bills of lading of the same tenor be issued.
>
> In consideration of the compliance by Waterman Steamship Corporation, and its agents with this request, we agree to protect, indemnify and save harmless yourselves, your agents, the carrier, and the vessel transporting the goods, its owner, charterer, master and agents against any and all claims and demands of any kind and nature arising out of the issuance of said new negotiable bills of lading, as well as against and [sic] all loss, damage and expense, including the cost of court and counsel fees which may arise or be incurred by reason of any such claims and demands and we further agree to deliver to Waterman Steamship Corporation or Waterman's agent the original bills of lading if same shall ever be found. [Emphasis added].

The consideration given by Waterman under these agreements was the issuance of three new negotiable bills of lading for each of the New York and New Orleans shipments. The wording of the CBI Agreements covering each of the New York and New Orleans shipments was as follows:

> The original bill of lading covering the above shipment is not presently available. It is our desire that you not deliver to anyone holding the original of said blading [sic] and that you give instructions to your personnel or agents to proceed at once with the delivery of above cargo to Van Ekris and Stoett, Inc. N.Y. or their order, without waiting for the production of these documents of title.
>
> In consideration of your complying with our request, we hereby guarantee and undertake to hold you and each of you harmless and keep you and each of you indemnified against all claims and demands of any kind and nature, arising from your compliance with this request, or under the above bill of lading or other bills of lading issued covering said cargo, as well as against all loss, damage and expense, including the cost of court and counsel fees, which may arise or be incurred by reason of said compliance, under said bladings [sic], or claims and demands arising therefrom. [Emphasis added].

Based on the difference in the underscored language in the recitation of consideration in the two sets of agreements, Waterman argues that the consideration for the CBI Agreements was in fact different because of the additional promise not to deliver the coffee to the holder of the original bill of lading and to instruct personnel to proceed with delivery to Van Ekris. Waterman contends that it was never under any obligation under the Addis Agreements to de-

---

Lonray to remit the price of the New Orleans shipment. Zervos subsequently cross-claimed against Lonray for conversion. Citibank then cross-claimed against Lonray for reimbursement under letters of credit issued at Lonray's request. Marine Midland similarly cross-claimed against Van Ekris to recover against it in the event that the Ethiopian parties are successful in their cross-claim against Marine Midland. Next, Lonray cross-claimed against Solomat for breach of the contract for the sale of the coffee and against the Ethiopian parties and Waterman for liability over in the event

that Zervos is successful in his claim against Lonray for conversion. Waterman thereupon counterclaimed for indemnity from Addis Bank and CBI in the event that it is ultimately held liable. Van Ekris subsequently added a cross-claim against Waterman for untimely delivery of the shipment to it and damage thereto. It also added a counterclaim against Zervos for damages in the event that Zervos turns out to have been Solomon's agent or had knowledge of the allegedly unlawful obtaining by Solomon of the bill of lading for the New York shipment.

liver the shipment to the party presenting the duplicate original bills of lading and that even if it were, that this obligation was waived by Addis Bank's signing and becoming a party to the CBI Agreements.

█ A duplicate original bill of lading serve the same purpose as that of original bills of lading, *i. e.*, to enable the party holding the document to present it and to obtain possession of the goods. Section 7–403 of the New York Uniform Commercial Code (McKinney 1964),[4] provides in pertinent part that: "The bailee must deliver the goods to a person entitled under the document . . . ." The term "document" is defined as a document of title under § 7–102, which in turn is defined in § 1–201(15) to include bills of lading. Under § 7–402,

> "Neither a duplicate nor any other document of title purporting to cover goods already represented by an outstanding document of the same issuer confers any right in the goods, *except as provided in the case of . . . substitutes for lost, stolen or destroyed documents.*" [Emphasis added.]

And, under § 7–601(2), a bailee may deliver goods to a person claiming under a missing document without court order, provided it does so in good faith and even though it takes the risk of remaining liable to any person injured thereby. Thus, once it went so far as to issue the duplicate original set, Waterman was obliged to deliver the goods to the party presenting them. The contention that Addis Bank could have waived the requirement of delivery by executing the CBI Agreements is unpersuasive. It is tantamount to arguing that the defense of lack of consideration may be waived merely by execution of a contract for which no consideration was granted.

4. Although no party addressing the motion pending before the court has discussed what law governs concerning the interpretation of the CBI indemnities, all parties have assumed that New York law controls. The court concurs that New York law does apply here. The CBI agreements were issued by a New York bank (albeit an "Edge Act" Bank, 12 U.S.C. § 611 *et seq.* (1970), authorized only to engage

█ Waterman also claims that its risk increased when Zervos presented the original bills of lading. This argument too is unavailing. The risk that someone would present the original bills of lading came into existence the minute Waterman issued the duplicate originals. It was to protect itself against this very risk that Waterman sought the Addis Agreements.

Having already bound itself by the agreements issued by Addis Bank to deliver the shipments of coffee to the holders of the duplicate original bills of lading, Waterman could not thereafter offer the identical consideration to CBI for the issuance of the CBI Agreements. In *Arend v. Smith*, 151 N.Y. 502, 45 N.E. 872 (1897), the New York Court of Appeals made the following remarks:

> "The payment of a valid and admitted debt by the one who owes it is no foundation for a promise, even by the creditor, let alone a stranger to the original consideration. The defendant parted with nothing that the law recognizes as of value, and suffered nothing that the law recognizes as an injury. . . . and it is well settled that 'the performance of an act which the party is under a legal obligation to perform cannot constitute a consideration for a new contract.'" 151 N.Y. at 504–505, 45 N.E. at 872–873.

*Accord, Regis Radio Corp. v. American Employers Insurance Co.*, 30 Misc.2d 341, 214 N.Y.S.2d 976, 980 (Sup.Ct.1961); *Berwin Paper Corp. v. Village of Dansville*, 50 N.Y. S.2d 636, 641 (Sup.Ct.1944). As further noted by Williston,

> "When a party under a contractual duty to do a certain act performs it under an agreement that it shall be the consideration for the promise of a third person, he incurs no legal detriment since he was

in foreign transactions), for the benefit of a New York shipper who was to deliver goods to a New York purchaser. The only other country whose law could conceivably apply would be Ethiopian law on account of the contacts Ethiopia has with the case. In any event, however, the parties have not put before the court any foreign law for the court's guidance.

**506**

previously bound to perform that very act." 1 S. Williston, *Contracts* § 131 (3d ed. 1957).

*Accord,* 9 N.Y.Jur., Contracts § 101 (1960). Thus, no consideration supported the issuance of the CBI Agreements.

Because I find that there was insufficient consideration for the issuance of the CBI Agreements, it is unnecessary for me to address the numerous other arguments raised by the opponents to this motion.

Waterman's motion for summary judgment against CBI is hereby denied.

SO ORDERED.

### MEMORANDUM DECISION

### ON MOTION TO CONSOLIDATE

 This is a motion by the Ethiopian parties, Addis Ababa Bank, National Bank of Ethiopia and Solomat, P.L.C. for an order consolidating the above-entitled action with *Koninklijke Nedlloyd, b.v. v. Nikiforos Zervos v. S.S. Sam Houston*, 76 Civ. 985 (LG) (hereinafter the "Nedlloyd" action) pursuant to Rule 42(a), Federal Rules of Civil Procedure. The facts in the *Zervos v. S.S. Sam Houston* case are set out in the court's opinion of December 7, 1976. The *Nedlloyd* action arises out of the third shipment of coffee from Solomat destined for the port of San Francisco.

It is this court's view that there are common issues of law and fact in each action and that consolidation of these two cases will substantially aid judicial economy and convenience. *United States v. Knauer*, 149 F.2d 519 (7th Cir. 1945), *aff'd*, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946); *DeFigueiredo v. Trans World Airlines*, 55 F.R.D. 44, 46 (S.D.N.Y.1971). *See also* C. Wright & A. Miller, *Federal Practice and Procedure* § 2383 (1971).

The issue basic to each action is the question of the right to the proceeds of the shipments of coffee as between Zervos on the one hand and the Ethiopian parties on the other. Dependent upon that issue is the issue present in each of these cases as to Zervos' claim against Waterman and Nedl-

loyd for conversion. Similarly, common claims arise as to the Ethiopian parties' claims against each of Waterman and Nedlloyd based upon the alleged alteration of bills of lading which is said to have assisted Solomon's so-called theft of the bills of lading.

It is clear that there are other issues raised by the cases which are collateral to the main claim with respect to ownership of the coffee. But the determination of the main claim will be dispositive of most of the collateral issues. Therefore, while consolidating these cases for all purposes at this time, a trial with respect to the main claim will precede trial of the remainder of the issues in order to make conduct of the trial of the other issues as orderly as possible.

SUBMIT ORDER.