STRAPEX CORPORATION, Plaintiff,

v.

METAVERPA N.V. and Leonard P.
Brown, Defendants.

No. 85 Civ. 2178 (RWS).

United States District Court,
S.D. New York.

April 11, 1985.

Seward & Kissel, New York City (Anthony R. Mansfield, Mark J. Hyland, Ronald A. Nimkoff, New York City, of counsel), for plaintiff.

Proskauer, Rose, Goetz & Mandelsohn, New York City (Steven J. Stein, Minna Schrag, New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Strapex Corporation ("Strapex") brought this action against, defendants B.V. Metaverpa ("Metaverpa") and Leonard Brown ("Brown") alleging breach of contract, unjust enrichment, tortious interference with prospective economic advantage, and prima facie tort. On March 20, 1985 Strapex obtained an *ex parte* order of attachment and restraining order against Metaverpa. Strapex now moves in accordance with N.Y. CPLR 6211(b) to confirm the order of attachment and restraining order. For the reasons discussed below, the motion is denied.

**Facts**

Metaverpa is a corporation with its principal place of business in Maartensdijk, Holland, engaged in the business of manufacturing newspaper strapping machines. Strapex is a North Carolina corporation authorized to transact business in New York that, among other things, purchases strapping machines from Metaverpa and then sells and services the machines. Brown was employed by Strapex from 1973 until late 1984, and from 1981 until the time he left Strapex was responsible for maintaining Strapex's customer relationship with The New York Times. Since approximately 1974, Strapex and its corporate predecessors, Mid-States Packaging Systems and Weld-Loc Systems, Inc. (collectively, "Strapex") have been selling Metaverpa machines to The Times. On September 1, 1972 Metaverpa entered into an agreement with Strapex giving Strapex the exclusive right to distribute Metaverpa's model P–53 package binding machine in the United States. By its terms the agreement expired on September 1, 1980. The parties did not enter into any subsequent written agreement.

According to Strapex, in approximately October 1982 Strapex commenced a marketing plan, headed by Brown, designed to culminate in the sale of twenty to thirty strapping machines to The Times. In late 1982 Strapex purchased two model HSM–30 heat seal machines from Metaverpa and shipped them to The Times to use on a trial basis. According to Strapex, this marketing plan was undertaken with the knowledge, consent and encouragement of Metaverpa. During the next few months, Strapex worked with The Times and Metaverpa in an effort to modify the machines to

meet The Times' requirements. In February 1983 the first two machines were removed and in May 1983 two additional Model HSM–30 machines, which included additional parts sold to Strapex by Metaverpa on the understanding that the parts would be resold to The Times, were purchased by Strapex from Metaverpa and installed at The Times. These machines also failed to meet The Times' requirements and were removed in October 1983.

In late February 1984 Strapex shipped two USM–65 ultrasonic machines purchased from Metaverpa to The Times to commence a third trial term. These machines, which are more advanced than the older HSM models, use ultrasound to seal bundles. According to Strapex, in May 1984 Strapex paid the expenses of Metaverpa employees to travel to New York to monitor the effectiveness of these machines. Metaverpa claims that it shipped the USM–65 machines to The Times on its own behalf in February of 1984, although it does not offer evidence to refute Strapex's submission of documents in support of its claims. Metaverpa also contends that its employees travelled to New York in May on Metaverpa's behalf and except for a small sum were not reimbursed by Strapex.

Strapex claims that in June of 1984, Brown and Paul Verhoef ("Verhoef"), Metaverpa's commercial manager, met with a representative of The Times who told them that The Times was completely satisfied with the operation of the machines. In August of 1984 Strapex sent a price quotation to The Times for the purchase of twenty Metaverpa machines at $27,500 per machine, totalling $550,000, including a number of terms and conditions relating to the proposed sale. This record contains no evidence concerning the reaction of The Times to this proposal. In early December of 1984, Brown resigned his position with Strapex. Shortly thereafter, Verhoef and Brown met with a representative of The Times in New York. Subsequent to this meeting, Metaverpa obtained an order to sell twenty-eight USM–65 ultrasonic bundling machines to The Times.

In its action, Strapex claims that it had the exclusive right to sell Metaverpa machines to The New York Times and that with the help of Brown, Metaverpa breached its agreement to give Strapex exclusive rights and unjustifiably interferred with the relationship between Strapex and The Times by usurping Strapex's order. It also contends that Metaverpa's actions were performed with deliberate intent to injure Strapex and that Metaverpa has been unjustly enriched at Strapex's expense.

## Discussion

N.Y.C.P.L.R. 6212(a) provides:

> On a motion for an order of attachment, or for an order to confirm an order of attachment, the plaintiff shall show ... that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exists, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.

Strapex has successfully demonstrated that it has a cause of action. Furthermore, because Metaverpa is a foreign corporation, Strapex has met the requirements of § 6201(1). However, at this preliminary stage of the proof Strapex has not met its burden of establishing probable success on either its contract or its tort claims.

### Breach of Contract

Strapex contends that by selling strapping machines to The New York Times Metaverpa has breached an agreement granting Strapex the exclusive right to sell Metaverpa machines to The Times. Strapex concedes that there is no evidence of any written contract granting Strapex these exclusive rights; the only written contract between the parties expired in 1980. However, Strapex asserts that the parties implicitly renewed that contract, and claims that the course of dealings between Strapex and Metaverpa is evidence of this implied agreement. In particular, Strapex suggests that Metaverpa's awareness of Strapex's efforts to market machines to The Times, and the degree to

which Metaverpa aided in these efforts by altering machinery and providing machanical assistance, supports the conclusion that Metaverpa implicitly agreed to give Strapex the exclusive right to sell its machines to The Times.

■ Strapex has failed to establish the existence of any implied agreement as to exclusivity between Strapex and Metaverpa. The evidence presented as to the course of dealings between the parties could support a variety of conclusions as to the nature of their relationship. There is no evidence that Strapex was the exclusive agent for Metaverpa or that it was anything more than a middleman selling Metaverpa products. Because Strapex cannot point to any definite or concrete evidence of a contract, *Joseph Martin Jr. Delicatessen Inc. v. Schumacher*, 436 N.Y.S.2d 247, 249, 52 N.Y.2d 105, 417 N.E.2d 541 (1981), it has failed to meet its burden of proving probable success on its contract claim.

### Tortious Interference with Prospective Economic Advantage

■ In order to establish a prima facie case of tortious interference with prospective economic advantage, a plaintiff must show "the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair, or in any other way improper." *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983) (emphasis in original). Where interference with which a prospective contract is intended "at least in part to advance the competing interest of the interferer" the interference will be excused unless the means employed include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Guard-Life Corp. v. S. Parker Hardware Manuf. Corp.*, 428 N.Y. S.2d 628, 632, 50 N.Y.2d 183, 406 N.E.2d 445 (1980) (citing Restatement (Second) of

Torts § 768). Interference with a plaintiff's business relations with a third party can be found if the plaintiff had a "reasonable expectancy of a contract" with the third party, which can result from "mere negotiations." *Morse v. Swank, Inc.*, 459 F.Supp. 660, 667 (S.D.N.Y.1978).

■ Metaverpa claims that the stricter standard as to interference should be applicable because Metaverpa and Strapex are competitors. Whichever standard is applied, however, Strapex's claim must fail because it has failed to establish that Metaverpa knowingly interfered with Strapex's dealings with The Times. While Metaverpa may have been aware of Strapex's long term intent to sell machines to The Times because of its role in placing the machines at The Times, Strapex cannot rely on this implied knowledge to prove actual interference. According to the evidence submitted, the last point at which Metaverpa had any active involvement in Strapex's marketing plan was in May of 1984 when Metaverpa travelled to New York, apparently at Strapex's request and expense, to monitor the effectiveness of the USM machines, a trip which Metaverpa claims was taken on its own behalf. The Metaverpa contract was not entered into until six months later. Strapex has submitted no evidence which would allow the conclusion that its initial marketing plan restricted Metaverpa's ability to enter into contracts with The Times six months after its involvement with Strapex's plan was concluded. While "mere negotiations" may in certain circumstances be sufficient, where, as here, the "negotiations" consisted of a general marketing plan carried out over the space of two years they are not concrete enough to make any sale by the manufacturer actionable absent proof of an exclusivity agreement.

If, however, Metaverpa knew that Strapex had submitted a detailed bid to The Times in August of 1984 and subsequently obtained the exact same order for itself, the fact that Strapex had not entered into a contract with The Times but was still in the process of negotiating would not defeat

Strapex's claim. *See United Euram Corporation v. Occidental Petroleum Corp.*, 123 Misc.2d 574, 474 N.Y.S.2d 372, 375 (Sup.Ct. New York County 1984). However, Strapex has failed to establish that Metaverpa had any knowledge of the submission of this bid. The only evidence to which Strapex can point is that Brown signed the cover letter submitted with the bid and that Brown met with Verhoef and a Times representative in December of 1984 immediately before Metaverpa concluded its agreement with The Times. Strapex contends that it can be implied that Brown conveyed his knowledge of Strapex's bid to Verhoef. However, both Brown and Verhoef have submitted affidavits denying that any information was passed on to Metaverpa, and Strapex has failed to submit anything which would support its conclusion. Absent proof that Metaverpa knew that Strapex was involved in actual negotiations with The Times, its procurement of a sales contract does not constitute tortious interference. Based on the evidence submitted, Strapex has failed to meet its burden of proving probable success on the tortious interference claim.

**Unjust Enrichment**

In order to recover for unjust enrichment, a plaintiff must show that "1) defendant was enriched; 2) that such enrichment was at the expense of the plaintiff; 3) that the circumstances were such that in equity and good conscience the defendant should make restitution." *Chase Manhattan Bank National Association v. Banque Intra, S.A.*, 274 F.Supp. 496, 499 (S.D.N.Y.1967). Strapex contends that Metaverpa was unjustly enriched by virtue of Strapex's time, effort and expense in marketing Metaverpa's machines to The Times. It claims that Metaverpa was able to take advantage of Strapex's preliminary efforts and because of these efforts was spared the expense of trying out various machines with The Times and establishing The Times specific requirements.

Strapex has failed to establish that Metaverpa was enriched at Strapex's expense in a manner that would entitle Strapex to restitution. Strapex unsuccessfully engaged in activities designed to bring about an order from The New York Times. The majority of its marketing efforts were directed towards selling HSM heat sealing machines, and only the last two machines installed were model USM–65 ultrasonic machines, the machines The Times eventually ordered. Metaverpa contends that Strapex had resisted handling the ultrasonic machines prior to this time because they felt the machines were too sophisticated for the United States market. Metaverpa also asserts that it has been marketing ultrasonic machines since 1981 and that it demonstrated the machines at United States trade shows on at least two occasions. Given the above circumstances, Strapex has not presented sufficient evidence to support a conclusion that Metaverpa unjustly benefitted from Strapex's marketing efforts. There is no evidence that Metaverpa would have engaged in a similar marketing strategy in order to gain an order from The Times. Strapex has not sufficiently established that Metaverpa made use of any information it gained from Strapex's efforts. Accordingly, Strapex has failed to meet its burden of proving probable success on the unjust enrichment claim.

**Prima Facie Tort**

Strapex also claims that even if Metaverpa did not commit an otherwise illegal act in obtaining The Times order, its action constituted a prima facie tort. The elements of a cause of action for a prima facie tort are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful. *Curiano v. Suozzi*, 480 N.Y.S.2d 466, 469, 63 N.Y.2d 113, 469 N.E.2d 1324 (Ct. App.1984). The sole motivation for the act must be "disinterested malevolence." *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 464 N.Y.S.2d 712, 59 N.Y.2d 314, 451 N.E.2d 459 (1983).

Strapex has failed to establish that the only motivation for Metaverpa's

act of obtaining The Times order was the intentional and malicious infliction of harm. "Where there are other motives, *e.g.*, profit, self-interest, business advantage, there is no recovery under tort prima facie." *Squire Records, Inc. v. Vanguard Recording Society, Inc.*, 25 A.D.2d 190, 191–92, 268 N.Y.S.2d 251 (1st Dept.1967). On the evidence presented, Strapex has not met its burden of proving probable success on its prima facie tort claim.

Because Strapex has failed to meet its burden of proving probable success on any of its claims, its motion to confirm the order of attachment and for a restraining order is denied with leave to renew upon presentation of sufficient evidence to support its claims.

IT IS SO ORDERED.