**HEALTH PLANS, INC., and Freedom Care, Inc., Plaintiffs,**

v.

**NEW YORK LIFE INSURANCE CO., Defendant and Third–Party Plaintiff,**

v.

**SENTRY LIFE INSURANCE CO., Third–Party Defendant.**

Civ. A. No. 91–40022–NMG.

United States District Court, D. Massachusetts.

Sept. 18, 1995.

Dennis Pojani, MacCarthy, Pojani & Hurley, Worcester, MA, Philip J. MacCarthy, MacCarthy, Pojani & Hurley, Worcester, MA, for Health Plans Inc. and Freedom Care, Inc.

Sarah C. Columbia, A. Hugh Scott, Choate, Hall & Stewart, Boston, MA, for New York Life Insurance Company.

Gerard R. Laurence, Milton, Laurence & Dixon, Worcester, MA, Kenneth P. Borden, Higgins, Cavanagh & Cooney, Providence, RI, for Sentry Life Insurance Company.

## MEMORANDUM AND ORDER

GORTON, District Judge.

The plaintiffs, Health Plans, Inc. ("Health Plans") and Freedom Care, Inc. ("Freedom Care"), bring this action against the defendant, New York Life Insurance Company ("New York"), claiming breach of contract, breach of implied covenants of fair dealing, fraud and violations of M.G.L. c. 93A. New York has counterclaimed against Health Plans for breach of contract, violations of M.G.L. c. 93A and libel.

New York also filed a separate action (No. 91–40047) against Sentry Life Insurance Co. ("Sentry") alleging tortious interference of contract, misappropriation of confidential business information, unfair competition and violations of M.G.L. c. 93A. Sentry, in turn, counterclaimed against New York, asserting tortious interference with advantageous business relationships and violations of M.G.L. c. 93A. The Court (per Young, J.) consolidated the lawsuit initiated by New York, No. 91–40047, with this case, No. 91–40022, on June 24, 1991.

Pending before the Court are the following motions:

1) motion of New York for summary judgment on all claims asserted against it by plaintiffs, Health Plans and Freedom Care,

2) motion of New York for summary judgment on the counterclaims brought by Sentry, and

3) motion of Sentry for summary judgment on the claims brought by New York.

For the reasons stated below, the Court will allow the motions of New York for summary judgment and the motion of Sentry for summary judgment with respect to Count 5 of New York's complaint. Sentry's motion for summary judgment with respect to Counts 1–4 will be denied.

## I. BACKGROUND

The relevant facts are recited in the light most favorable to the non-moving parties. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

Health Plans, a Worcester, Massachusetts, corporation, created and administered a multiple employer trust ("MET") called the Employers Group Insurance System ("EGIS"). The underlying purpose of the EGIS was to allow small employers to join together to obtain group health insurance. As the third-party administrator of the EGIS, Health Plans marketed the plan, collected the premiums and processed the claims. Health Plans did not, however, provide the actual insurance coverage for the EGIS.

In the early-to-mid 1980s, Health Plans retained Sentry to provide the insurance coverage for the EGIS. In 1987, though, Health Plans became concerned with Sentry's premium rate increases, and, as a result, switched to New York Life on July 1, 1987.

When New York first agreed to provide the coverage for the EGIS, the EGIS had a total of approximately $5 million in annualized premiums. In 1988, as other METs failed, New York agreed to bring more insureds into the EGIS. Consequently, by the end of 1988, the EGIS had annualized premiums in excess of $30 million.

Although the EGIS was growing, New York nevertheless claimed that it was losing money. New York, therefore, negotiated a new deal with Health Plans in February, 1989. Under the new contract, New York agreed to provide the insurance coverage for the EGIS through 1989, and both parties agreed to 1) implement more restrictive underwriting criteria, 2) increase premiums, and 3) impose expense controls.

Later that same year, Health Plans became concerned that New York's new premiums were too high. As a result, Health Plans entered into renewed negotiations with both Sentry and New York. At the end of those negotiations, Health Plans decided to keep New York as the insurance carrier for the EGIS for the ensuing year. Accordingly, on October 26, 1989, Health Plans and New York signed a "letter agreement" to continue their relationship through at least December 31, 1990. They further agreed that: 1) New York would advance $200,000 to Health Plans as a marketing allowance for 1990, and 2) if Health Plans did not make a minimum of $6 million in sales during 1990, it would refund the $200,000.

By June, 1990, Health Plans had sales in the amount of only $1.15 million, and the total EGIS premium had decreased to approximately $15 million. Those poor results led to New York's decision, in July, 1990, to abandon the MET marketplace. Accordingly, New York advised Health Plans to find another insurance carrier for the EGIS as soon as possible, but nevertheless agreed to continue insuring the EGIS for up to a year if Health Plans could not secure another carrier before then.

Health Plans immediately began its search for a new carrier for the EGIS and entered into negotiations with Sentry. Health Plans and Sentry eventually reached an agreement in November, 1990. Under that agreement, they offered to the 87% lowest-risk insureds the opportunity to transfer to a new EGIS trust ("EGIS II") covered by Sentry, effective January 1, 1991.

New York objected to the Sentry/Health Plans agreement, because it transferred less than the entire EGIS block. The remaining 13% of the highest-risk insureds remained with New York. New York claims that, by "cherry-picking" the lowest-risk insureds, Sentry and Health Plans 1) violated the exclusive marketing provision of New York's contract with Health Plans, 2) misused New York's proprietary information, and 3) breached Health Plan's duty to conserve the EGIS block of business.

New York continued to insure the 13% high-risk participants of the EGIS until May, 1991, at which time the number of EGIS insureds had dwindled to a point that entitled New York to terminate the policy. New York claims that it lost more than $1 million as a result of the partial transfer.

## II. DISCUSSION

### A. Summary Judgment Standard

■ Summary Judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to the nonmoving party and indulge all reasonable inferences in its favor. O'Connor, 994 F.2d at 907.

■ With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidence to support the non-moving party's case." FDIC v. Municipality of Ponce, 904 F.2d 740, 742 (1st Cir.1990), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. Id. In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992) (*citing Andersen* ). The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56.

## B. New York's Motion for Summary Judgment with Respect to All Claims Asserted Against it by Health Plans and Freedom Care

### 1. Count 2: Breach of Contract[1]

The plaintiffs, Health Plans and Freedom Care, claim that New York breached two contracts in this case: 1) the Administrative Services Agreement between Health Plans and New York, and 2) an agreement by New York to insure the "Freedom Care plan."

#### a. The Administrative Services Agreement

New York and Health Plans entered into the Administrative Services Agreement ("ASA") on January 1, 1989, and the parties amended it on October 26, 1989. Under the amended agreement, either party, upon 180 days written notice, could terminate the contract without cause, so long as that termination was effective no earlier than December 31, 1990.

Health Plans claims that New York breached the ASA by "constructively" terminating it. The plaintiffs, however, cannot point to any provision of the ASA that has been breached by New York.

The ASA expressly gives both parties the right to terminate as of December 31, 1990. Although New York announced its decision in July, 1990, to exit the MET marketplace, it reaffirmed its commitment to insure the EGIS through all of 1990. Indeed, New York agreed to cover the EGIS for up to a year if Health Plans could not secure another carrier before then, and Health Plans does not dispute that New York did, in fact, provide coverage through May, 1991.

Health Plans relies on certain oral representations made by New York personnel to argue that New York executed an oral contract by which it committed itself to the EGIS for the "long haul." Health Plans' mere allegations of such a commitment, however, are insufficient to withstand summary judgment. Fed.R.Civ.P. 56. The plaintiffs have failed to raise a genuine issue of material fact as to either 1) a meeting of the minds necessary to form an oral contract by which New York was obligated to cover the EGIS for the "long haul," *May v. Wilcox*, 182 A.D.2d 939, 582 N.Y.S.2d 294 (1992) ("to create a binding contract, there must be a meeting of the minds as to the essential terms of the agreement"), or 2) the consideration necessary to support such a contract. *See Zervos v. S.S. Sam Houston*, 427 F.Supp. 500, 505 (S.D.N.Y.1976).[2]

■ Furthermore, New York continued to cover the EGIS through May, 1991. A jury, therefore, could not find a breach of New York's alleged oral contract to extend its coverage of the EGIS until June, 1991, which is at least eleven months, and probably closer to fifteen months, after New York's alleged promise to insure the EGIS for the "long haul." Thus, New York's alleged oral agreement could not have been performed within one year, and, consequently, is unenforceable under the statute of frauds. *See Bank of New York v. Sasson*, 786 F.Supp. 349, 352–53 (S.D.N.Y.1992).

■ Finally, Health Plans' argument that it relied to its detriment on New York's oral representations fails for at least two reasons.

---

1. In count 1, Health Plans seeks a judgment declaring that it did not breach any obligation owed to New York. New York has filed a counterclaim alleging that Health Plans did, in fact, commit a breach of contract. Because neither party has moved for summary judgment on those competing claims, the Court does not address Health Plans' alleged breach of contract in this Memorandum and Order.

2. New York law governs both the contract and the fraud claims in this case because 1) the ASA specifically provides that it should be "construed under the laws of the State of New York," and 2) the Court finds that New York has a more significant relationship to the plaintiffs' tort claims. In any event, there are no substantial differences between the law of New York and that of Massachusetts.

First, the plaintiffs did not bring a claim for promissory estoppel or detrimental reliance. *Cf. Id.* at 352 (party moved for leave of court to add claim for detrimental reliance); *Cyberchron Corp. v. Calldata Systems Development, Inc.*, 831 F.Supp. 94, 96 (E.D.N.Y. 1993) (where plaintiff explicitly asserts claims for promissory estoppel and breach of contract in two separate, discrete counts). Second, Health Plans was an experienced player in the MET marketplace. It had already switched insurers in 1987, and had considered switching insurers again in 1989. Health Plans was aware of the fluid nature of the business and certainly should have understood the ramifications of the clear, unambiguous language of the ASA which allowed New York to terminate it. This Court, therefore, concludes that, based upon the scant evidence presented by Health Plans, a reasonable jury could not infer that Health Plans relied to its detriment on certain ambiguous statements that New York was committed to the EGIS for the "long haul," especially because those alleged statements contradict the express terms of the ASA. *See Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (explaining elements of detrimental reliance).

In sum, the Court finds no credible evidence suggesting that New York improperly terminated the ASA. New York cannot be held liable simply because it chose not to extend its contract with Health Plans.

### b. The "Freedom Care plan"

■ The plaintiffs claim that New York breached its contract with Health Plans, Freedom Care or both, in relation to New York's commitment to insure the "Freedom Care plan." (The plaintiffs do not clarify the party with which New York executed the alleged contract at issue.) The plaintiffs rest their entire claim on a letter dated March 20, 1990, from Ms. Patricia Ehlbeck, an account consultant at New York, to Ms. Susan Crossman, a vice president of Health Plans. That letter states:

> After evaluation of this program, I am pleased to confirm that New York Life will insure benefits of the Freedom Care plan. Certificate work is in its final phase of completion and our actuaries will be determining rate levels upon my forwarding of information received from your office today.

.    .    .    .    .

> We anticipate Freedom Care being effective on an insured basis with New York Life on or before 5/1/90. With this in mind, I would appreciate receiving all materials requiring approval before 4/16/90.

For the following reasons, the Court rejects the plaintiffs' claims that the subject letter was either a contract or a commitment upon which they relied to their detriment:

1. The Court finds as a matter of law that the letter, by itself, does not constitute a contract. The letter does not show 1) a meeting of the minds with respect to the essential terms of an insurance policy, *see May*, 582 N.Y.S.2d at 294, or 2) consideration by any party other than, perhaps, New York, *see Zervos*, 427 F.Supp. at 505. (Indeed, the ambiguity of the letter explains why it is so difficult to determine the parties to the alleged contract.)

2. The text of the letter itself only "anticipates" that the Freedom Care plan will be insured at some point in the future, but it makes no firm commitment on behalf of New York. More importantly, the letter indicates that further approvals were necessary. *See Cyberchron Corp.*, 831 F.Supp. at 108 ("to find an enforceable contract, there must be a manifestation of mutual consent to the essential terms").

3. The evidence presented by both New York and Health Plans suggests that the letter merely confirmed New York's commitment to enter into further negotiations with Health Plans. In fact, the parties did subsequently engage in such negotiations over the coverage of the Freedom Care plan but could not reach a final agreement. *See Tribune Printing Co., Inc. v. 263 Ninth Avenue Realty, Inc.,* [88 A.D.2d 877] 452 N.Y.S.2d 590, 593 ("a mere agreement to agree, in which a materi-

al term is left for future negotiations, is unenforceable").

4. The plaintiffs' amended complaint asserts no claim for detrimental reliance. Count 2 explicitly alleges that the "Defendant ... breached its *express contractual obligations* ..." (emphasis added). The plaintiffs cannot now amend their complaint to state a claim for detrimental reliance.

5. The plaintiffs' mere allegations that they were "damaged by New York breach of its express and implied covenants," (*see* Health Plans' Memorandum in Opposition to New York's Motion for Summary Judgment ("Health Plans' Memorandum") at 29) are insufficient to oppose a motion for summary judgment. Fed.R.Civ.P. 56.

Because the plaintiffs have failed to provide sufficient evidence supporting a claim for breach of contract based on New York's "commitment" to insure the Freedom Care plan, the Court finds that there are no material facts in dispute and that New York is entitled to judgment on that claim as a matter of law. *See Id.; May,* 582 N.Y.S.2d at 294; *Zervos,* 427 F.Supp. at 505.

### 2. Count 3: Breach of Implied Contractual Covenants of Good Faith and Fair Dealing

In Count 3, the plaintiffs claim that New York breached its "implied contractual covenants of good faith and fair dealing." The complaint does not specify how New York allegedly breached those covenants, but, in their opposition papers, the plaintiffs identify two "violations": 1) New York's unjustified premium rate increases, and 2) New York's representations that it would remain committed to the EGIS in the "long haul." *See* Health Plans' Memorandum at 32–34.

■ Under New York law, in every contract there exists an implied covenant of good faith and fair dealing that restricts the parties from doing anything which would destroy or injure the right of the other party to receive the fruits of the contract. *Bank of New York,* 786 F.Supp. at 353. In this case, the plaintiffs apparently claim that New York breached the covenant of good faith and fair

dealing implied in its ASA. The plaintiffs, however, have failed to allege that New York "interfered with any existing right to full performance during the term" of that agreement. *See Id.* at 354.

#### a. New York's Rate Increases

■ Health Plans argues that New York breached its implied covenant of good faith and fair dealing by raising its premium rates to an unjustified level. At the hearing on this motion, Health Plans acknowledged that New York had full authority to adjust those rates. Indeed, New York's insurance contract with the EGIS expressly provided: "New York Life may change prospectively any method, rate, factor or table used to compute the rate or the premium for this policy ..." The plaintiffs, though, ignore the explicit contractual provisions and seek to impute a new obligation into their contract with New York. An obligation not to raise premiums, however, may not be imposed on New York because it would be inconsistent with the express terms of the contract between the parties. *Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc.,* 192 A.D.2d 1066, 596 N.Y.S.2d 230, 231–32 (1993).

Furthermore, even if New York were restricted from raising its premiums to a level that could injure Health Plans' promised benefits under the ASA, the plaintiffs have not presented any evidence showing that New York did so. In its statement of uncontested facts, Health Plans focuses on two rate increases, one in September, 1988, and the other in March, 1989. The plaintiffs' expert, Mr. William Bluhm, testified during his deposition that those two rate increases did not conform with "good actuarial practice" and led to a "deterioration spiral" which drove healthy insureds out of the EGIS.

This Court finds, however, that New York remained committed to the success of the EGIS throughout the term of the contract, regardless of the decline in the number of insureds in the EGIS. Indeed, Health Plans acknowledges both that New York transferred $200,000 to Health Plans to help it market the EGIS in 1990 and that New York personnel participated in various marketing seminars. Mr. Bluhm may be correct that

New York made poor business decisions in raising the premiums, and the EGIS may have suffered losses in 1989, but it had suffered losses in other years, and an implied covenant of good faith and fair dealing does not require 1) New York to be a successful insurance company, and/or 2) that New York take actions contrary to its own economic welfare in order to benefit Health Plans. *See Bank of New York,* 786 F.Supp. at 354.

Finally, the Court notes that the alleged breaches (i.e., the rate increases) occurred in 1988 and March, 1989. *See* Health Plans' Rule 56.1 Statement at 8. Nevertheless, Health Plans renegotiated its contract with New York in October, 1989. Health Plans' claim that New York violated an implied covenant not to raise premium rates, therefore, appears disingenuous, because, seven months after the second rate increase, Health Plans was satisfied enough with New York's insurance coverage that it extended the ASA with New York through at least December, 1990.

Accordingly, the Court finds that New York did not breach an implied covenant by raising the premiums of the EGIS.

### b. New York's Premature Termination of the Administrate Services Agreement

Health Plans argues that New York breached its implied covenant of good faith and fair dealing by not fulfilling its commitment to insure the EGIS in the "long haul." As explained above, however, the express, written terms of the ASA allowed New York to terminate the contract after December 31, 1990, and Health Plans has not presented sufficient evidence to support its claim that New York personnel modified that contract through subsequent oral representations. Therefore, because a covenant "may not be implied when it would be inconsistent with other terms of the contract between the parties," the Court concludes that New York did not breach an implied covenant to insure the EGIS over the "long haul." *See Chrysler Credit Corp.,* 596 N.Y.S.2d at 231; *see also Tribune Printing Co., Inc.,* 452 N.Y.S.2d at 593 ("a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable"). Accordingly, the Court

concludes that the defendant is entitled to judgment on Count 3.

### 3. Count 4: Fraud

█ In Count 4, the plaintiffs assert:

[t]he defendant has made material misrepresentations to [Health Plans] and to [Freedom Care] which representations [Health Plans] and [Freedom Care] each relied upon to their detriment and as a result thereof [Health Plans] and [Freedom Care] have each sustained substantial damages.

Amended Complaint, ¶ 32.

The cryptic allegations in Count 4 make it difficult to discern whether the plaintiffs are asserting a claim of common law fraud or detrimental reliance. Health Plans' opposition brief, however, reveals that Count 4 is, in fact, an attempt by the plaintiffs to allege fraud. *See* Health Plans' Memorandum at 39 ("Health Plans has proffered evidence, which if believed, constitutes fraud"). That attempt is unsuccessful.

Fed.R.Civ.P. 9(b), which governs the procedure for pleading fraud in federal court in all diversity suits, *see Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985), provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The First Circuit Court of Appeals has strictly construed that requirement. *Curtis v. Duffy,* 742 F.Supp. 34, 38 (D.Mass.1990). In *Hayduk,* the First Circuit explained that:

mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated.

*Hayduk,* 775 F.2d at 444.

In the case at bar, the plaintiffs do not approach the specificity required under Rule 9(b). The plaintiffs' veiled allegations have forced both the defendant and the Court to search in vain for the misrepresentations that might form the basis of their claim. *See Id.* (stating that the main purpose of Rule 9(b) is to give notice to the defendant of the fraudulent claims against it). In Health

Plans' Memorandum, the plaintiffs maintain that certain unidentified representatives of New York made vague statements regarding New York's "commitment" to the EGIS, but they have failed to identify in their pleadings the exact source, the date or the content of the alleged misrepresentations. *See New England Data Services, Inc. v. Becher*, 829 F.2d 286, 292 (1st Cir.1987) (to satisfy Rule 9(b), party must describe time, place and content of communication). Accordingly, the Court finds that the plaintiffs have not satisfied the pleading requirements of Rule 9(b) and that the defendant is, therefore, entitled to judgment on Count 4.

■ Furthermore, even if this Court found that the plaintiffs satisfied the pleading requirements of Rule 9(b), it would nevertheless allow the defendant's motion for summary judgment with respect to Count 4, because the plaintiffs have submitted no evidence suggesting that New York had knowledge that its statements (whatever those statements might have been) were false or misrepresented New York's actual intentions. *See Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 933 (D.Mass.1995) (explaining elements of fraud). For instance, there is no evidence that New York was not "committed" to the EGIS (whatever that means) in early 1990. To the contrary, there is evidence that New York transferred $200,000 to Health Plans to help market the EGIS in 1990, and New York's personnel were actively participating in marketing seminars with Health Plans. In fact, the evidence suggests that New York decided to leave the MET marketplace only after a full review completed by the new executive vice president, Seymour Sternberg.

Furthermore, Health Plans has not offered persuasive evidence that it relied on New York's alleged misrepresentations. *See Id.* Indeed, it would be difficult to prove that Health Plans relied on ambiguous statements expressing a "commitment" to the EGIS when those statements ran directly contrary both to the express terms of the ASA and to Health Plans' prior experience with insuring the EGIS.[3] *See Wilsen Assocs. Real Estate*

*Corp. Inc. v. Pizilly*, 204 A.D.2d 777, 611 N.Y.S.2d 694, 695 (1994) (party seeking to recover for fraud must show that it "justifiably relied" on the alleged misrepresentations).

### 4. Count 5: Unfair and Deceptive Acts in Violation of M.G.L. c. 93A

In Count 5, the plaintiffs claim that New York committed unfair and deceptive acts in violation of Chapter 93A. The Court, however, finds that 1) the defendant's alleged misconduct did not occur primarily and substantially in Massachusetts, *see Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 637, 473 N.E.2d 662 (1985), and 2) the plaintiffs have failed to allege facts sufficient to establish a violation of Chapter 93A. *See Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 970 (D.Mass.1991). Accordingly, the Court will allow the defendant's motion for summary judgment with respect to Count 5.

### C. New York's Motion for Summary Judgment With Respect to Sentry's Counterclaims

#### 1. Count 1: Tortious Interference

In Count 1 of its counterclaim, Sentry alleges that New York interfered with its business relations in two distinct instances. The first instance relates to New York's allegedly fraudulent statements in 1989 that it was "committed" to the EGIS. Sentry argues that was a "misrepresentation" that caused Health Plans to select New York in October, 1989, instead of Sentry, as the insurer of the EGIS. The second alleged interference occurred in 1990 and 1991, when New York attempted to persuade Health Plans to transfer the entire EGIS block to Sentry, rather than the 87% most healthy insureds. Because Sentry does not address the second claim in its Memorandum in Opposition, and because New York's "interference" in 1990 and 1991 did not disturb Sentry's business relationship with Health Plans, the Court will allow New York's motion for summary judgment with respect to that second claim of interference. *See PPX Enter-*

---

**3.** Health Plans switched insurers from Sentry to New York in 1987 and considered another

change in 1989, and thus had an awareness of the shifting nature of the MET market.

*prises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 270 (2d Cir.1987).

■ With respect to the first claim, Sentry asserts, in essence, that New York tortiously interfered with Sentry's *prospective* business relationship with Health Plans. In order to establish a prima facie case of tortious interference with prospective business relations under New York law, Sentry must show that New York 1) used unlawful or otherwise improper means to effect the interference, or 2) had the sole motive of injuring Sentry. *See Fantaco Enterprises, Inc. v. Iavarone,* 161 A.D.2d 875, 555 N.Y.S.2d 921, 922 (1990); *Paper Corp. of the United States v. Schoeller Technical Papers, Inc.,* 724 F.Supp. 110, 119 (S.D.N.Y.1989); *Strapex Corp. v. Metaverpa N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985).

■ Sentry does not allege that New York's interference was with the sole motive of harming Sentry, but rather argues that New York employed "improper means" by deceiving Health Plans as to New York's "commitment" to the EGIS. In *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980), the New York Court of Appeals explained that improper means include:

> physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.

*Id.* 428 N.Y.S.2d at 632, 406 N.E.2d at 449.

In this case, Sentry claims that New York employed improper means by defrauding Health Plans, but its claim suffers from the same defects as that of Health Plans:

1) Sentry does not allege New York's fraud with sufficient particularity, *see· Hayduk,* 775 F.2d at 443–44, and

2) Sentry has not presented sufficient evidence from which a rational jury could find either that New York had knowledge that its statements were false when it made them, or that Health Plans relied on the alleged misrepresentations to its detriment. *See Wilsen Assocs. Real Estate*

*Corp. Inc.,* 611 N.Y.S.2d at 695; *Piantes,* 875 F.Supp. at 933.

The Court will, therefore, allow New York's motion for summary judgment with respect to Count 1 of Sentry's counterclaim.

## 2. Count 2: Violations of M.G.L. c. 93A

In Count 2 of its counterclaim, Sentry alleges that New York engaged in unfair competition in violation of M.G.L. c. 93A. Sentry and New York now both agree that the events and occurrences at issue in this case did not take place primarily and substantially in Massachusetts. The Court concurs with their assessment. Accordingly, this Court will allow New York's motion for summary judgment with respect to Count 2 of Sentry's counterclaim. *See Bushkin Assocs., Inc.,* 393 Mass. at 637, 473 N.E.2d 662.

## D. Sentry's Motion for Summary Judgment with Respect to All Claims Asserted Against it by New York

New York has asserted five claims against Sentry. Those claims relate to Sentry's acquisition of less than all (87%) of the EGIS block on January 1, 1991, and to Sentry's inspection of New York's business records during 1989, when Sentry was deciding whether to cover the entire EGIS block.

### 1. Counts 1 and 2

■ New York claims that Sentry is liable for interfering with two of its contracts: 1) the ASA with Health Plans, and 2) the insurance policy with the EGIS. Sentry argues that it is entitled to summary judgment on both of those claims because:

a) Sentry's arrangement with Health Plans to cover the EGIS did not begin until January 1, 1991, the day after New York's exclusive marketing agreement in the ASA with Health Plans expired. Sentry Memorandum at 8–11.

b) Sentry was unaware of the exclusive marketing agreement contained in the ASA. Sentry Memorandum at 11.

c) New York has failed to allege facts sufficient to show that Sentry used improper means to interfere with New York's contractual relations. Sentry Memorandum at 11–13.

In response, New York persuasively points out that the ASA was not terminated on December 31, 1990. The contract was terminable upon 120 days notice provided that it was not terminated *earlier* than December 31, 1990. New York expressed its desire to get out of the MET marketplace in July, 1990, but it did not exercise its right to terminate the ASA. Indeed, New York continued to cover the EGIS through May, 1991. Consequently, the ASA and the exclusive marketing agreement were still effective on January 1, 1991.

New York further argues that Sentry was aware of the ASA and the exclusive marketing agreement which it included. Apparently, New York faxed its notice of objection to the partial transfer of the EGIS to Sentry in December, 1990, before that transfer actually took place. Sentry replies that, even if it was aware of New York's objection to the partial transfer, it was not aware of the exclusive marketing agreement that existed between New York and Health Plans. The Court concludes that there are material facts in dispute with respect to that issue.

Finally, New York contends that Sentry employed improper means to interfere with the two subject contracts by misappropriating New York's confidential business information. Sentry denies that charge, but the Court finds that, based upon the record viewed in the light most favorable to New York, a rational jury could find that Sentry employed improper means to interfere with New York's contracts.[4]

Because this Court finds that there are material facts in dispute with respect to Counts 1 and 2, Sentry's motion for summary judgment thereon will be denied. *See* Fed. R.Civ.P. 56.

### 2. Counts 3 and 4

Counts 3 and 4 are based on New York's claim that Sentry misappropriated New York's confidential business information

by examining New York's records during the fall of 1990, while it was determining whether to cover the EGIS. *See, e.g., Licata & Co., Inc. v. Goldberg,* 812 F.Supp. 403, 409 (S.D.N.Y.1993) ("[c]ustomer information and customer lists can constitute trade secrets"). Sentry argues that it is entitled to summary judgment on Counts 3 and 4 because New York had consented to Sentry's inspection of the records at issue. Sentry further contends that such inspection was necessary because New York wanted to transfer the EGIS to a new insurer, and a prospective insurance carrier must look at the records of the current insurer to make an accurate appraisal of the business.

New York has presented evidence that Sentry exceeded the limited consent that New York had granted for prospective insurers to examine its records. That evidence is not overwhelming, but the Court finds that it is sufficient to raise a genuine issue of material fact. Accordingly, the Court will deny Sentry's motion for summary judgment with respect to Count 3, alleging misappropriation of confidential information, and Count 4, alleging unfair competition.

### 3. Count 5

In Count 5, New York claims that Sentry violated M.G.L. c. 93A. As explained above, the conduct at issue did not occur primarily and substantially in Massachusetts. The Court, therefore, will allow Sentry's motion with respect to Count 5. *See Bushkin Assocs., Inc.,* 393 Mass. at 637, 473 N.E.2d 662.

### ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. the motion of New York Life Ins. Co. for summary judgment with respect to the claims brought by the plaintiffs, Health Plans, Inc. and Freedom Care, Inc., is **ALLOWED;**

---

4. The Court notes that, with respect to Count 2, New York does not need to prove that Sentry employed improper means to interfere with New York's insurance policy, because that policy was a contract for a definite term. *See Guard–Life Corp.,* 428 N.Y.S.2d at 634 ("'[w]ith respect to a contract for a definite term, persuasion to breach

alone ... has been sufficient to impose liability on one who thereby interferes with performance"). Thus, even if New York failed to submit any evidence showing that Sentry used improper means, Sentry's argument in favor of summary judgment on Count 2 would still fail.

2. the motion of New York Life Ins. Co. for summary judgment with respect to the counterclaims brought by Sentry Life Ins. Co. is **ALLOWED;**

3. the motion of Sentry Life Ins. Co. for summary judgment with respect to Count 5 of the complaint of New York Life Ins. Co. is **ALLOWED;** and

4. the motion of Sentry Life Ins. Co. for summary judgment with respect to Counts 1 through 4 inclusive of the complaint of New York Life Ins. Co. is **DENIED.**

So Ordered.