ABRAMS, Appellant,

v.

AMERICAN COMPUTER TECHNOLOGY et al., Appellees.

[Cite as *Abrams v. Am. Computer Technology,* 168 Ohio App.3d 362, 2006-Ohio-4032.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050460.

Decided Aug. 4, 2006.

Jacobs, Kleinman, Seibel & McNally, and Mark J. Byrne, for appellant.

White, Getgey & Meyer Co., L.P.A., David P. Kamp, and Carl J. Stich Jr., for appellees.

Sylvia Sieve Hendon, Judge.

{¶ 1} Plaintiff-appellant, Robert J. Abrams, appeals the summary judgment entered by the trial court in favor of his former employers on his claims for wrongful termination. We affirm.

### *Abrams' Employment with ACT and CCI*

{¶ 2} In 1995, Abrams was hired as a sales manager for American Computer Technology ("ACT"). ACT sold computer hardware and software, including

SHOP–TRAC, its own software program. Jerry McMahon was the majority owner and chairman of the board of ACT.

{¶ 3} By the following year, Abrams was hired for a similar position at Computer Creations, Inc. ("CCI"), a computer-networking company also owned by McMahon. Abrams was named vice president of marketing for both ACT and CCI. Robert Kennedy, the former owner of CCI, became president of ACT in April 1997.

{¶ 4} In early 1997, ACT halted development of its SHOP–TRAC software. McMahon instructed Abrams to send letters to each of ACT's customers to notify them of the change and of the company's commitment to continued support for the software's existing users. Despite McMahon's instructions, Abrams failed to notify a majority of ACT's customers.

{¶ 5} McMahon learned that Abrams' failure to contact customers about the software had caused some of them to panic. Customers had begun to call the company to ask whether it was going out of business.

{¶ 6} As McMahon attempted to reassure customers of ACT's viability and continuation of support for its product, he discovered widespread customer dissatisfaction with Abrams. Customers reported that they did not trust Abrams and had no confidence in him. According to McMahon, "[s]ome customers felt [that Abrams had] misled them and deliberately lied to them."

{¶ 7} In early April 1997, Kennedy told McMahon that some employees in ACT's Cincinnati office had discovered potentially "pirated" software, that is, software that may have been copied or used without authorization. Kennedy asked McMahon if he knew whether employees had sold the same software to different customers. McMahon said that he knew nothing about it and instructed Kennedy to further investigate the matter. Kennedy also told Abrams about the pirating issue.

{¶ 8} On May 9, 1997, Abrams and Kennedy met with an attorney, Thomas Jennings, to discuss the possibility of merging ACT with CCI. During the meeting about the merger, the men briefly discussed the pirated software issue and certain company financial statements. Jennings billed CCI for his services.

{¶ 9} In June 1997, McMahon told Abrams that he needed to improve his overall performance. Specifically, McMahon wanted Abrams to enhance his relationships with current customers, to obtain new customers, and to provide training for the company's newer employees.

{¶ 10} McMahon soon learned that Abrams' deficiencies went beyond customer dissatisfaction. Abrams had not been forthright about his expense reports or his whereabouts during work hours. He had given unauthorized account credits to

certain customers. And without authorization, Abrams had instructed a company programmer not to bill for services rendered to a particular customer.

{¶ 11} McMahon met with Abrams and Kennedy on June 17, 1997. Kennedy and Abrams jointly prepared an agenda for the meeting that included the pirating issue. At the meeting, Abrams brought up the pirating issue, and McMahon again told Kennedy to look into the matter.

{¶ 12} Abrams was terminated in July 1997. At the time, Abrams was 50 years old.

{¶ 13} The day after his termination, Abrams called Jennings to tell him what had happened and to ask for his advice. But Jennings told Abrams that he could not represent him personally because he represented ACT and CCI.

### Abrams Filed Suit

{¶ 14} According to Abrams' complaint, his termination was the result of (1) age discrimination, (2) his actions in alerting his employers to illegal activities within the companies, and (3) his consultation with a lawyer. Following a hearing, the trial court entered summary judgment in favor of ACT, CCI, McMahon, and Kennedy on each of Abrams' claims.

{¶ 15} In a single assignment of error, Abrams now argues that the trial court erred in its entry of summary judgment.

### Our Standard of Review

{¶ 16} We review the granting of summary judgment de novo.[1] Summary judgment may be appropriately granted only if there exists no genuine issue of material fact, the movant is entitled to judgment as a matter of law, and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion, and that conclusion is adverse to the nonmoving party.[2]

### Age–Discrimination Claim

{¶ 17} R.C. 4112.02 prohibits an employer from discharging an employee without just cause on the basis of the employee's age. The ultimate inquiry in an age-discrimination case is whether an employee was discharged on account of age.[3]

---

1. See *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, at ¶ 5.

2. See *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

3. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 505, 575 N.E.2d 439.

{¶ 18} A discharged employee may establish a prima facie case of age discrimination under R.C. 4112.02 by different methods. An employee may show discriminatory intent indirectly by means of the *McDonnell Douglas* analysis or by direct evidence that discriminatory intent had motivated the termination.[4]

## 1. No Indirect Evidence of Discriminatory Intent

{¶ 19} In the absence of direct evidence, a discharged employee may establish a prima facie violation of R.C. 4112.02 under a four-part test adopted in Ohio from the United States Supreme Court's decision in *McDonnell Douglas Corp. v. Green*.[5] Using that analysis, an employee must demonstrate that he (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by a substantially younger person.[6]

{¶ 20} In this case, the defendants conceded that Abrams had met the first three prongs of the test. But they argued, and the trial court agreed, that Abrams had failed to establish the fourth prong because he presented no evidence that he had been replaced by a substantially younger person.

{¶ 21} This court has held that "[a] person is 'replaced' only when another employee is hired or reassigned to perform that person's duties. A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work."[7]

{¶ 22} Abrams argues that he was replaced by Pete Griffith, a man in his twenties. Abrams contends that, following his termination, Griffith assumed his sales duties.

{¶ 23} Griffith was hired as a salesman in February 1998, about six months after Abrams' termination and three months after Abrams had filed his age-discrimination claim. About a month before Griffith was hired, Warren Kappler, a man in his fifties, was hired as a salesman.

{¶ 24} Abrams' suggestion that he was little more than a salesman was belied by the evidence. The duties of the new salesmen were far less involved than

---

4. See *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 128, 672 N.E.2d 145.

5. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807.

6. *Coryell v. Bank One Trust Co., N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781, paragraph one of the syllabus; *Byrnes*, supra, 77 Ohio St.3d at 128, 672 N.E.2d 145.

7. *Atkinson v. Internatl. Technegroup, Inc.* (1995), 106 Ohio App.3d 349, 359, 666 N.E.2d 257, citing *Barnes v. GenCorp, Inc.* (C.A.6, 1990), 896 F.2d 1457, 1465.

Abrams' duties as vice president of marketing. Griffith and Kappler were hired simply to provide more "sales horsepower" in the Cincinnati area.

{¶ 25} Abrams' duties, on the other hand, were much broader in scope. Abrams supervised the sales forces in both Cincinnati and Dayton and was actively involved in the hiring and firing of salespeople. While selling was a portion of his duties, Abrams testified that his "number one job at the company was to provide direction in terms of where we were going in the market place, what products, what technology we were going to apply." Abrams provided guidance to the salespeople, generated leads for them, and taught them how to sell larger products to make more money.

{¶ 26} In describing his roles at ACT and CCI, Abrams testified, "I think my contribution was significant from the standpoint of providing business planning and marketing direction and identifying the technologies that we wanted to sell and apply to the marketing and customers. I think it had to do with providing sales management to our sales force. I think it had to do with training, showing them other ways of putting together projects, doing it more completely, more profitably. I think it had to do with focusing on the, not only the market, but our specific products that we were going to deal with."

{¶ 27} Abrams' own description of his roles established that he was not simply a salesman. And following Abrams' termination, no one was hired or reassigned to assume his significant leadership responsibilities. Because Abrams was not replaced, he could not establish indirectly a prima facie case of age discrimination under R.C. 4112.02.

### 2. No Direct Evidence of Discriminatory Intent

{¶ 28} Abrams argues that he was not required to demonstrate that he had been replaced under the *McDonnell Douglas* analysis, because the record contained direct evidence that his discharge was motivated by discriminatory intent. In support of his claim, Abrams points to remarks made by McMahon and Kennedy.

{¶ 29} About a month before he fired Abrams, McMahon told Abrams that he was concerned about a certain employee's back problems because, at the employee's age, "he didn't want to have the exposure and liability that might come up from these back problems." In discussing a second employee, McMahon indicated, "[W]e've got younger guys up in Dayton that can handle that stuff." Abrams acknowledged that, at the time of his termination, both men still worked for the defendants.

{¶ 30} Abrams testified that several conversations he had had with Kennedy in the months before his termination "centered around [their] industry being a

young industry, [their] employees being young. [Kennedy] had mentioned that he and [Abrams], * * * along with Mary [Koogler], were the oldest people there." Kennedy had said to Abrams, "Geez, you're even older than I am." Abrams conceded the truth of Kennedy's observation about the youth of those employed in the computer industry: "There's a lot more younger people in the industry than older people."

{¶ 31} Age-related comments that are isolated, vague, or ambiguous, or that refer to other employees, cannot support a finding of age discrimination.[8] Here, McMahon's remarks about other employees and Kennedy's isolated and vague remarks about the comparably younger workers in the computer industry were unrelated in time or fact to Abrams' termination.

### 3. No Prima Facie Case of Discrimination

{¶ 32} Abrams failed to demonstrate, either by the *McDonnell Douglas* standard or by direct evidence, that a genuine issue of material fact existed as to the likelihood that his termination was motivated by discriminatory intent. Consequently, we hold that the trial court properly entered summary judgment in favor of the defendants on Abrams' age-discrimination claim.

### *Whistleblower Claim*

{¶ 33} According to Abrams, his employers terminated him in retaliation for his reporting matters related to potentially false financial statements and pirated software.

{¶ 34} Under R.C. 4113.52, Ohio's Whistleblower Statute, an employer may not take disciplinary or retaliatory action against an employee who reports certain violations.[9] The statute addresses a situation in which an employee, in the course of his employment, becomes aware of a legal violation that the employer has the authority to correct, and the employee reasonably believes that the violation is either a criminal offense that is likely to cause an imminent risk of physical harm or a hazard to public health or safety, or a felony.[10]

{¶ 35} Under those circumstances, the employee must orally notify his supervisor or other responsible officer of the employer of the violation and subsequently file with that person a written report that provides sufficient detail to identify and

---

**8.** *Byrnes,* supra, 77 Ohio St.3d at 130, 672 N.E.2d 145, citing *Phelps v. Yale Security, Inc.* (C.A.6, 1993), 986 F.2d 1020, 1025.

**9.** R.C. 4113.52(A)(1)(a).

**10.** Id.

describe the violation.[11] If the employee satisfies those requirements and the employer fails to correct or make a good-faith effort to correct the violation within 24 hours, the employee may then file a written report with outside authorities.[12]

{¶ 36} "Clearly, the provisions of R.C. 4113.52(A)(1) contemplate that the employer shall be given the opportunity to correct the violation. The statute mandates that the employer be informed of the violation both orally and in writing. An employee who fails to provide the employer with the required oral notification and written report is not entitled to statutory protection for reporting the information to outside authorities." [13]

{¶ 37} In this case, even had there been a violation to report, Abrams was required to provide his employer with both oral and written notice of the violation. The record reveals that Abrams did neither. In his deposition, Abrams admitted that his supervisor, Kennedy, had verbally informed him about the pirating issue and had asked him to look at certain financial statements. And Abrams had not given written notice to Kennedy or McMahon of his concerns.

{¶ 38} Abrams, though, contends that he had met the notice requirement of R.C. 4113.52 in two ways. First, Abrams points to a letter written by Jennings, the lawyer whom he and Kennedy had consulted about a possible merger of ACT and CCI. Jennings's letter had summarized their May 1997 meeting and had included a remark about the potential exposure stemming from the financial statements and pirated software. Second, Abrams claims that the written agenda he prepared for a June 1997 meeting with McMahon had addressed the same violations.

{¶ 39} Abrams' argument that these instances somehow satisfied both the verbal and the written notification requirements of R.C. 4112.52 is less than ingenuous. It was Kennedy, Abrams' supervisor, *who told him* and McMahon about the pirating issue. Abrams made no oral report of the matter. Moreover, Jennings' summary of their earlier meeting was *prepared by* Jennings, the company lawyer, and was addressed to *both Kennedy and Abrams*. Finally, Kennedy and Abrams had *co-authored* the agenda for the June 17 meeting with McMahon. Abrams made no written report of any violations.

---

11. Id.

12. Id.

13. *Contreras v. Ferro Corp.* (1995), 73 Ohio St.3d 244, 248, 652 N.E.2d 940.

{¶ 40} To be afforded protection as a whistleblower, an employee must strictly comply with the mandates of R.C. 4113.52.[14] In other words, if an employee does not "whistle" both orally and in writing, he is not a whistleblower. Here, because Abrams failed to properly notify his employers of potential legal violations and deprived his employers of the opportunity to make corrections, he did not properly blow the whistle.

{¶ 41} Because no genuine issue of material fact remained with respect to Abrams' failure to comply with the mandates of R.C. 4113.52, the trial court properly entered summary judgment in favor of the defendants on Abrams' whistleblower claim.

### *Public Policy Claim*

■■■ {¶ 42} In Ohio, an at-will employee may be terminated without reason, so long as the termination is not contrary to law.[15] An exception to the employment-at-will doctrine exists when a termination is contrary to the clear public policy of Ohio.[16]

■■■ {¶ 43} To prove wrongful termination in violation of public policy, a plaintiff must demonstrate four elements: (1) that a clear public policy existed and was manifested in a state or federal constitution, in a statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) that the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element).[17] The clarity and jeopardy elements pose questions of law and are to be determined by the court.[18]

---

14. *Contreras*, supra, 73 Ohio St.3d 244, 652 N.E.2d 940, syllabus.

15. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus.

16. *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph two of the syllabus.

17. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 69–70, 652 N.E.2d 653, quoting Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398–399.

18. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 151, 677 N.E.2d 308, citing *Collins*, 73 Ohio St.3d at 70, 652 N.E.2d 653.

{¶ 44} In this case, Abrams argues that he was terminated in retaliation for consulting Jennings in violation of Ohio's clear public policy. Abrams points to this court's decision in *Chapman v. Adia Servs., Inc.*, in which we held that an employer violates public policy by terminating an employee for consulting an attorney regarding an issue that affects the employer's business interests.[19]

{¶ 45} In *Chapman*, we identified three sources of public policy that encouraged an employee to consult with an attorney about possible claims that would affect an employer's business interests: the "Open Courts" provision in Section 16, Article I of the Ohio Constitution; Ethical Considerations 1–1 and 2–1 of the Ohio Code of Professional Responsibility, which state that all persons should have ready access to legal representation; and the common law, which recognizes an individual's need for legal representation for the redress of wrongs.[20]

{¶ 46} The public-policy sources identified in *Chapman* reflect Ohio's interests in encouraging an individual's access to legal redress for injuries done to the individual. But those interests are not implicated when an individual, in his capacity as an officer of a corporation, consults with the corporation's attorney about matters affecting the corporation's interests. We discern no public interest that would be furthered by protecting a corporate officer from termination following his consultation with corporate counsel. It would be illogical for an employee to seek protection for consulting the attorney for an entity whose interests were diametrically opposed to his own interests.

{¶ 47} Here, in Abrams' pretermination consultation with Jennings, he was not seeking to explore his own rights. Instead, Abrams was acting as a vice president seeking advice about the corporations' potential exposure. And Abrams' post-termination call to Jennings confirmed the attorney's conflict of interest: Jennings refused to counsel Abrams with respect to potential claims against the corporations that Jennings represented. Under these circumstances, we conclude that Abrams failed to demonstrate that he was wrongfully discharged in violation of public policy.

## Conclusion

{¶ 48} Because Abrams failed to demonstrate that genuine issues of fact remained with respect to his wrongful-termination claims, we hold that the trial

---

19. *Chapman v. Adia Servs., Inc.* (1997), 116 Ohio App.3d 534, 688 N.E.2d 604.

20. *Chapman,* 116 Ohio App.3d at 542–543, 688 N.E.2d 604.

court properly entered summary judgment in favor of the defendants. We overrule the assignment of error and affirm the trial court's judgment.

Judgment affirmed.

DOAN, P.J., and GORMAN, J., concur.