OPINION
{¶ 1} This is an appeal by plaintiff-appellant, M. Linda Mazzitti ("Mazzitti"), from a judgment of the Franklin County Court of Common Pleas, entering summary judgment in favor of defendants-appellees,[1]
Garden City Group, Inc. ("GCG"), Richard Cohen ("Cohen"), and David Isaac ("Isaac"), on Mazzitti's claims for age discrimination, *Page 2 
promissory estoppel, and an unpaid bonus. For sake of clarity and ease of reference, we have provided an outline of the background facts below, and have discussed the facts in more detail later as needed to understand the individual assignments of error.
 {¶ 2} Mazzitti was born on March 30, 1949. She graduated from law school in 1982, and began working for Nationwide Insurance Company ("Nationwide") in 1983. Her career with Nationwide spanned 21 years, and at the time of her retirement on April 1, 2004, she had held the position of Assistant General Counsel/Manager Class Action Unit for four years.
 {¶ 3} The record discloses that Mazzitti's employment at Nationwide was not without incident. A memorandum from LeRoy Johnson, Mazzitti's supervisor, dated November 20, 2003, noted that while Mazzitti's performance had generated some favorable feedback from clients and peers, "there [had] been several incidents," which demonstrated problems with communication "(lack of communication and tone of communication), lack of client focus, and defensiveness regarding feedback and accountability, among others." (GCG's appendix to brief at 5.) Mr. Johnson indicated that he would meet with Mazzitti every two weeks to discuss her progress in tackling the problem areas he outlined, and that if she did not make progress within the next 60 days, she could be placed on "Performance Improvement." Id. Mazzitti's 2003 Performance Summary indicated that, as a result of the foregoing, she had "raised her awareness of the issues and began making progress to address those issues through changes in her behaviors." (Mazzitti's memorandum contra to GCG's motion for summary judgment at exhibit 1.) Mazzitti's progress earned her a satisfactory rating for 2003. *Page 3 
 {¶ 4} Nationwide was a client of GCG. During the course of GCG's relationship with Nationwide, Isaac, GCG's President, and Cohen, a Senior Vice President at GCG, had dealings with Mazzitti. Although it is disputed as to who initiated the discussions, the record discloses that in late 2003, Mazzitti, Isaac, and Cohen engaged in discussions regarding a potential move by Mazzitti to join GCG. Those discussions culminated in a proposed offer of employment, the terms of which were reflected in a "Term Sheet" ("Term Sheet") sent from Isaac to Mazzitti on December 29, 2003.
 {¶ 5} The Term Sheet provided in full:
 This term sheet reflects our proposed employment offer to you. Ideally, we would like to have you begin working for GCG immediately. If that is not possible we propose February 15, 2004 as a possible start date.
 Position: Vice President
 Job Duties: To be defined by the President and COO of GCG.
 Base Salary: $160,000, with employee performance reviews conducted annually to be used as basis for adjustments.
 Signing Bonus: $40,000; $20,000 payable after 30 days of employment with GCG and $20,000 payable after 6 months of employment with GCG.
 Office Location: New Albany, Ohio.
 Performance Incentive: A discretionary annual performance incentive payment which will be paid out of the Company's performance incentive fund (comprising 20% of GCG's EBITA earnings using accrual method of accounting).
 Stock Options: Eligible to receive stock options in Crawford and Company which are granted by the Senior Compensation and Stock Options Committee of the Crawford Company Board of Directors. *Page 4 
 Dues/Associations: Reimbursement for all relevant memberships or association dues to be approved by President of GCG.
 Business Expenses: Reimbursement for all business related travel and other expenses, such as travel, hotel, meals, and other transportation expenses.
 Other Benefits: Other typical benefits and programs afforded to officers and employees of GCG such as medical, dental, 401K, etc., which we believe are very market competitive, will be extended to you. Details of our current programs are attached to this term sheet.
 * * *
 We are excited about the prospect of you joining GCG and we look forward to discussing this Proposed Employment Term Sheet with you and to moving forward with our plans to have you join the GCG organization. Please give us a call to discuss this employment offer at your earliest convenience.
 {¶ 6} Mazzitti accepted the terms of GCG's proposed offer as reflected in the Term Sheet, which is silent as to the length of service contemplated. In that regard, when Mazzitti commenced her employment with GCG in February 2004, she received GCG's employee handbook and signed a form entitled, "Acknowledgment of Receipt and Understanding." The first page of the GCG employee handbook states, "[e]xcept as may otherwise be provided in a written contract of employment, all employees are employed `at will.'" (GCG appendix to brief at exhibit 4.) The second paragraph of the acknowledgment form signed by Mazzitti also provides, "[n]othing contained in the Employee Information Handbook is intended to create, nor shall be construed as creating, an expressed or implied contract or guarantee of employment for a definite or indefinite term." Id. at exhibit 3. *Page 5 
 {¶ 7} Mazzitti began her employment with GCG in its operations department, but was reassigned to work in the area of business development pertaining to insurance company class actions in July 2004. The reassignment did not affect Mazzitti's title of "Vice President," salary, or benefits package, although the nature of her job duties changed. According to Mazzitti, Cohen's initial plan for her was "to eventually be able to go out and meet with clients, either those [Cohen] didn't have time to meet with" due to his busy schedule, or those she procured on her own. (Mazzitti Depo. at 196.) That plan, however, never fully came to fruition. While Mazzitti did attend seminars, where she handed out business cards and made personal contacts, "much" of what she "actually" ended up doing was "crunching numbers on the formulas that applied to the pricing" of class action/administrative settlement matters. Id.; see, also, id. at 82. Mazzitti's employment with GCG lasted another four months; she was terminated on November 4, 2004, approximately nine months after she began her employment.
 {¶ 8} A little over a month before Mazzitti was terminated, GCG hired Victoria Oldham, who was born on August 27, 1979. Oldham, a recent law school graduate, had interviewed with Cohen in early September regarding employment at GCG. During the interview process, Oldham also met with Mazzitti, whose feedback to Cohen regarding Oldham was quite positive. Oldham began working for Cohen in late September, and her job duties and responsibilities included work "in the business development arena," providing assistance to and working "very closely" with Cohen, whose schedule was hectic due to his frequent travel, and conducting activities to "promote and seek out new business," such as, traveling and attending conferences. (Oldham Depo. at 11.) *Page 6 
Oldham's starting salary was $30,000, and was assigned the working title of "legal services coordinator" within the first month of her employment.
 {¶ 9} On May 3, 2005, Mazzitti filed a complaint against GCG, Isaac, and Cohen, alleging age discrimination, promissory estoppel, and breach of contract. On June 2, 2006, GCG moved for summary judgment, to which Mazzitti responded on June 26, 2006. In a decision dated July 17, 2006, the trial court granted summary judgment in favor of GCG. That decision was journalized in an entry on July 25, 2006.
 {¶ 10} On appeal, Mazzitti sets forth the following three assignments of error for review:
 I. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF AGE DISCRIMINATION IN THAT THE COURT FAILED TO CONSIDER ALL OF PLAINTIFF'S EVIDENCE THAT SHE WAS REPLACED BY A SUBSTANTIALLY YOUNGER EMPLOYEE.
 II. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF PROMISSORY ESTOPPEL IN THAT THE TRIAL COURT FAILED TO CONSIDER ALL OF PLAINTIFF'S TESTIMONY REGARDING PROMISES MADE TO HER AND MISCONSTRUED HER TESTIMONY REGARDING DEFENDANT'S ABILITY TO TERMINATE HER EMPLOYMENT DURING THE FIRST FIVE YEARS.
 III. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR AN UNPAID BONUS BY CONSTRUING THE EVIDENCE IN FAVOR OF DEFENDANT.
 {¶ 11} In her first assignment of error, Mazzitti contends that the trial court erred by granting summary judgment on her age discrimination claim. Appellate review of *Page 7 
summary judgment is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704, 711. Thus, we apply the same standard as the trial court and conduct an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107.
 {¶ 12} Pursuant to Civ.R. 56(C), summary judgment shall be rendered if:
 * * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *
Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66.
 * * * [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.* * *
Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. Once the moving party meets its initial burden, the nonmovant bears a reciprocal burden to produce competent evidence of the types listed in Civ.R. 56(C) showing that there is a genuine issue for trial. Id.; Civ.R. 56(E). Because summary judgment is a procedural device to terminate litigation, courts *Page 8 
should award it cautiously after resolving all doubts in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359.
 {¶ 13} In this case, Mazzitti alleges that GCG discriminated against her based on her age in violation of R.C. 4112.02, which makes it unlawful for an employer to discharge without cause or otherwise discriminate against a person with respect to any matter related to employment on the basis of age. According to Mazzitti, a female in her mid-50's, GCG replaced her with Oldham, a female in her mid-20's.
 {¶ 14} To prevail on an employment discrimination claim, the plaintiff must prove discriminatory intent. Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, 583. In an age discrimination case, Ohio courts follow the burden-shifting analytical framework set forth inMcDonnell Douglas Corp. v. Green (1973), 411 U.S. 792. Barker v.Scovill, Inc. (1983), 6 Ohio St.3d 146, 147-148. If a plaintiff establishes a prima facie case of age discrimination, the defendant-employer may overcome the presumption of discrimination inherent therein by articulating a legitimate, non-discriminatory reason for the plaintiff's discharge. Id. at paragraph one of the syllabus. Finally, the plaintiff must have the opportunity to show that the defendant's proffered rationale was a pretext for unlawful discrimination. Id.
 {¶ 15} A plaintiff may directly establish a prima facie case of age discrimination by presenting evidence of any nature, direct or circumstantial, to show that the employer more likely than not was motivated by discriminatory animus. Mauzy, at 586-587. Alternatively, as is the case here, a plaintiff may indirectly establish a prima facie case of age discrimination by demonstrating: *Page 9 
 * * * (1) [T]hat he or she was a member of the statutorily protected class, (2) that he or she was discharged, (3) that he or she was qualified for the position, and (4) that he or she was replaced by, or that the discharge permitted the retention of, a person not belonging to the protected class.
 Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, syllabus. The four-part Kohmescher standard is a descendant of the prima facie standard established in McDonnell Douglas. In Coryell v. Bank One TrustCo. N.A., 101 Ohio St.3d 175, 2004-Ohio-723, the Supreme Court of Ohio modified the fourth prong of a prima facie case of age discrimination to require the plaintiff to demonstrate that he or she "was replaced by, or the discharge permitted the retention of, a person of substantially younger age[,]" rather than a person outside the protected class. Id. at paragraph one of the syllabus.
 {¶ 16} GCG's motion for summary judgment raised no issue regarding whether Mazzitti could satisfy the first three elements, but, rather, focused its argument on her inability to satisfy the fourth. GCG maintained that Mazzitti's job responsibilities were redistributed between Isaac and Cohen, and, therefore, she was not replaced by Oldham. Thus, GCG argued that Mazzitti could not make out the fourth element of her prima facie case. The trial court agreed, concluding that summary judgment in favor of GCG was proper because Mazzitti failed to produce any evidence that she was replaced by Oldham.
 {¶ 17} In assigning error, Mazzitti argues that she sufficiently stated a prima facie case of age discrimination, and that summary judgment was granted only because the trial court "weigh[ed] evidence and view[ed] it through employer-biased glasses." (Mazzitti brief at 3.) Mazzitti contends that Oldham's deposition testimony "confirms" that she assumed Mazzitti's former duties and responsibilities, particularly, her "marketing *Page 10 
functions." Id. at 12. Citing to Atkinson v. International Technegroup,Inc. (1995), 106 Ohio App.3d 349, 359, for the proposition that "[a] person is replaced when another employee is hired or reassigned to perform that person's duties," Mazzitti maintains the evidence conclusively establishes that she was replaced by Oldham, and, thus, she has satisfied the fourth element of her prima facie case. (Mazzitti brief at 11.)
 {¶ 18} GCG, however, denies that Mazzitti was replaced by Oldham. The affidavits of Isaac, Cohen, and Oldham, proffered in support, echo the foregoing. Specifically, GCG maintains that after Mazzitti was terminated, Isaac and Cohen assumed her various business development responsibilities, and that Oldham's "job duties stayed the same." (Isaac affidavit at 8; Cohen affidavit at 6; Oldham affidavit at 6.) GCG further charges that Mazzitti has mischaracterized both the law and facts, contending there is no evidence in the record to support Mazzitti's theory of replacement. To that end, GCG highlights Mazzitti's deposition testimony wherein she concedes her argument is premised upon her own subjective "belief" that is based upon "nothing." (GCG brief at 9, citing Mazzitti Depo. at 82, 83, 84.) Based upon a review of the record before us, as well as the applicable law, we agree with the articulations espoused by GCG.
 {¶ 19} In the context of R.C. 4112.02, "[a] person is `replaced' only when another employee is hired or reassigned to perform that person's duties. A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." Atkinson, supra, at 359, citing Barnes v. GenCorp,Inc. (C.A.6, *Page 11 
1990), 896 F.2d 1457, 1465, certiorari denied, 498 U.S. 878. And, here, the record does not support Mazzitti's contention that she was "replaced."
 {¶ 20} First, Mazzitti has failed to proffer evidence to contradict GCG's assertion that Isaac and Cohen absorbed Mazzitti's business development job responsibilities. It is well-established that "[spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." Lilley v. BTMCorp. (C.A.6 1992), 958 F.2d 746, 752.
 {¶ 21} Second, and equally fatal, is that Mazzitti has failed to adduce any evidence that she was actually replaced by Oldham. A review of Oldham's deposition testimony, which Mazzitti touts as supporting her position, does nothing more than establish that Oldham continues to perform substantially the same duties that she had performed prior to Mazzitti's termination. It is undisputed that Oldham performed work-related, or similar in nature, to Mazzitti's work. The overlap between their job duties, however, was due to the inherent nature of business development activities. For that matter, the business development activities and related job duties of Cohen, Mazzitti, and Oldham, all overlapped to some degree. What is important for the purpose of our analysis, however, is that Oldham's job duties did not change after Mazzitti was terminated. Thus, as demonstrated by her testimony, Oldham did not "replace" Mazzitti within the meaning of Ohio law.Lilley, supra; Atkinson, supra; Langlois v. W.P. Hickman Systems, Cuyahoga App. No. 86930, 2006-Ohio-3737, at ¶ 14.
 {¶ 22} Further support for our conclusion can be found in Mazzitti's own deposition testimony. Mazzitti testified that "much" of what she "actually" did, with respect to her business development duties/marketing functions, was "crunch numbers." (Mazzitti *Page 12 
Depo. at 196; see, also, id. at 82.) She even expressed disappointment that so much of her time was spent crunching numbers, as opposed to "actually meeting with and learning from [Cohen] * * * ." Id. at 196. Conversely, Oldham testified that she will "occasionally put together a pricing estimate." (Oldham Depo. at 58.) The fact that Oldham will, at most, "occasionally" perform what Mazzitti spent "much" of her time doing, does not equate to Oldham having replaced Mazzitti. The record simply does not support Mazzitti's contention that Oldham assumed a substantial portion of her duties and replaced her. Stipkala v. AmericanRed Cross (C.A.6, 2000), 2000 U.S.App.Lexis 11833 (plaintiff was not replaced when younger employee assumed some, but not majority, of plaintiff's former duties); Lilley, supra; Abrams v. American ComputerTechnology, Computer Creations, Inc., 168 Ohio App.3d 362,2006-Ohio-4032; Atkinson, supra.
 {¶ 23} Additionally, Mazzitti acknowledged during her deposition that she had no evidence to support her belief that she had been replaced by Oldham, a concession which is borne out in the following exchange between GCG counsel and Mazzitti:
 Q. What functions of yours were replaced by Ms. Oldham?
 A. The — I'm assuming some of the marketing functions that I had. Once again, Rich and I traveled together to many of the seminars and handed out business cards, made personal contacts, sought through the lists of the attendees to find those that we felt would be appropriate contacts and those that might bring in business to The Garden City Group. And I believe at the time that I left The Garden City Group, Rich was working with Victoria to bring her into the fold and teach her some of the functions that we would have at these seminars.
 Q. Other than attending seminars, are there any other functions that you believe were yours that were replaced by Ms. Oldham? *Page 13 
 A. I'm fairly certain that once I left all of the records of contacts and all of the files that I had produced during my employment with The Garden City Group, that Victoria was asked to review those files, follow up on contacts and determine if there were any needs of the customers and clients and follow through making follow-up phone conversations and contacts with them.
 I — I also believe that she is probably sitting in the same office that I had and is working to understand the business functions that take place inside and answer some of the legal-type questions that were brought to my attention while I was there. Many of the probate issues and questions were brought to me by managers. And there were certain things like that that had to be followed up on a daily/weekly basis.
 Q. Are there any other functions of your job that have been replaced by Ms. Oldham?
 A. I'm — I was training with Rich to produce quotes. I first started doing those at Rich's office and at his desk with his assistance. And I then suggested that these be formatted so that they didn't have to be recreated, that they could be merely reproduced each time to give the clients a quote that didn't require that each of the forms be changed every time. And much of the work that I did during my tenure with Garden City Group was to produce these quotes along with Courtney Ziak who was Rich's office manager and assistant.
 Q. How is it that you have gained your knowledge of what Ms. Oldham has done since your employment was terminated by way of replacing your functions?
 A. I have no specific knowledge. I said I was assuming that she would be doing those things. Those were the things that I did. And obviously, it was something that Rich needed assistance on. He was traveling many, many hours. And since she was hired on, I assumed that she, since she was the only other attorney in the office, to my knowledge she was the only other attorney in the office, that she would be taking over those functions. *Page 14 
 Q. So all of your testimony that you have just given about what you assume or believe is just your guess, right?
 A. It's my belief, yes.
 Q. And that belief is based on nothing, correct?
 A. That's correct.
 Q. And so when you say here in paragraph 1 that your functions were replaced by a younger employee, the truth is you don't have any evidence that any of your functions were replaced by Ms. Oldham; is that correct?
 A. I have no evidence of that.
(Mazzitti Depo. at 80-85.)
 {¶ 24} Based on the foregoing, we find that Mazzitti has failed to proffer evidence to demonstrate that she was replaced by Oldham. Because Mazzitti was not replaced, she could not establish indirectly a prima facie case of age discrimination under R.C. 4112.02. Accordingly, we overrule Mazzitti's first assignment of error.
 {¶ 25} In her second assignment of error, Mazzitti claims that the court erred in granting summary judgment in favor of GCG on the issue of promissory estoppel. Mazzitti argues Cohen made several promises to her regarding job security and longevity, and she detrimentally relied upon these promises by "retiring from Nationwide, a secure place of employment for 21 years, and changing her career by joining GCG." (Mazzitti brief at 15.) Mazzitti supports her argument by directing us to several pages of her deposition transcript, which, she maintains, support her claim that Cohen made enforceable promises of a five-year term of employment. Mazzitti argues that the trial court disregarded certain portions of her deposition testimony, and misconstrued the testimony upon which it relied in reaching its conclusion. *Page 15 
 {¶ 26} GCG refutes Mazzitti's assertion that Cohen promised her a term of employment, and further asserts that the deposition testimony cited by Mazzitti does not lend support to her claim. GCG also argues that its position is buttressed by the Term Sheet, which accurately reflects GCG's offer of employment to Mazzitti, and does not contain any reference to a "five-year plan" or any promised term of employment.
 {¶ 27} In this case, the trial court held that GCG was entitled to summary judgment because Mazzitti had not presented any evidence to support her contention that Cohen and Isaac made statements that promised her a term of employment. The court opined that although "Cohen made reference to a five-year plan for himself and said that [Mazzitti] fit very well into that plan," Mazzitti was "unable to demonstrate that either Cohen or Issac promised her employment for at least the next five years." (Trial court decision at 4.) It further pointed out that in her deposition, Mazzitti "acknowledged that she knew she could be fired in the next five years for incompetence." Id. Thus, given the absence of a specific and unambiguous promise, the court found Mazzitti's claim for promissory estoppel failed as a matter of law.
 {¶ 28} In the present case, it is undisputed that Mazzitti did not have a written contract of employment. Under Ohio law, "unless otherwise agreed, either party to an oral employment-at-will employment agreement may terminate the employment relationship for any reason which is not contrary to law." Mers v. Dispatch Printing Co. (1985),19 Ohio St.3d 100, paragraph one of the syllabus.
 {¶ 29} The doctrine of promissory estoppel may be applied to at-will employment relationships where the employee is able to demonstrate that: (1) the employer made a representation of continued employment that could be deemed a promise; (2) the *Page 16 
employee relied upon the promise; (3) that reliance was reasonable and foreseeable; and (4) the employee is injured as a result of his reliance. See Kelly v. Georgia-Pacific Corp. (1989), 46 Ohio St.3d 134, paragraph three of the syllabus; Jelinek v. Abbott Laboratories (Sept. 13, 2001), Franklin App. No. 01AP-217.
 {¶ 30} A promise of future benefits or opportunities must contain aspecific promise of continued employment in order to merit a promissory estoppel exception to the employment-at-will doctrine. Boggs v. ScottsCo., Franklin App. No. 04AP-452, 2005-Ohio-1264, at ¶ 28, citingWing v. Anchor Media, Ltd. Of Texas (1991), 59 Ohio St.3d 108, paragraph two of the syllabus. It is well-established that representations "which do not specify a particular duration or term of employment are presumed to be terminable by either party at will for any reason not contrary to law." Hoyt v. Nationwide Mut. Ins. Co., Franklin App. No. 04AP-941,2005-Ohio-6367, at ¶ 41, quoting Moss v. Electroalloys Corp., Lorain App. No. 02CA008111, 2003-Ohio-831, at ¶ 12, quoting Anders v. SpecialtyChem. Resources, Inc. (1977), 121 Ohio App.3d 348, 351.
 {¶ 31} Given that Mazzitti maintains her deposition testimony contains sufficient evidence to support her promissory estoppel claim, we will begin our analysis by examining several[2] of the portions of the transcript to which Mazzitti has directed our attention.
 Q. Did you have any other discussions either en route or during the interviews in New York City about terms of employment?
 A. [Cohen] and I were in the small airplane together. And [Cohen] was very excited about my coming to The Garden City Group, talked about his plans for what he wanted to do *Page 17 
and the amount of work and the amount of time that he was putting in and how we needed each other, and that we were going to move the company into the future together. That his plan was, for himself, that he had four daughters, one who was still in high school, the other two were in college or working towards degrees, and a young daughter, I believe age five. And that upon his high school daughter's graduation from college, that he would very, very much like to move to Florida to be closer to his extended family, and that he would like to turn this — the operations of this office over to me; that he trusted me and wanted me to be there, and that we were going to move into the future together. So he had what he considered to be, you know, a five-year plan for himself, and that I fit very well into that plan.
(Mazzitti Depo at 46-47.)
 Q. Did Mr. Isaac ever promise you a specific term of employment at The Garden City Group?
 A. I believe there was a promise, yes.
 Q. When did Mr. Isaac make a promise to you regarding your employment term at The Garden City Group?
 A. When we discussed the terms at the breakfast at the Hilton, there was a clear understanding on everyone's part that we would be going into this in the long-range plan and that I would be there and they would be my employer for the long-term. I asked for assurances, I was given assurances.
 Q. What assurances were you given?
 A. The assurances that I wanted this company to be stable, to — if — to be economically and financially strong; that I intended to be with the company, and that I needed to have assurances that this would not be a fly-by-night, and that my term of employment there, with Garden City, would continue well into the future.
 Q. They didn't use any terms other than well into the future, did they?
 A. The terms were we have a long-range plan of growth. You fit perfectly into that long-range plan. We want you to assist *Page 18 
us in reaching these goals; that we are breaking into the insurance industry and we need your experience and background in the industry and your contacts in the industry; we want you to be with us through this growth period.
 Q. Did either Mr. Cohen or Mr. Isaac ever say anything more definitive to you other than what you have just described about a specific length of term of your employment?
 A. I don't recall any exact comments at this time.
(Mazzitti Depo. at 65-67.)
 {¶ 32} Later in her deposition, Mazzitti testified that both Cohen and Isaac told her their expectation was that she would be in it "for the long haul." Id. at 72-73. Mazzitti further testified that Cohen "frequently" made such assurances to her, and when asked whether Cohen used "those exact words," Mazzitti responded:
 Long-term, long haul, things like that. Into the future, well into the future, you know, past the time when he could move to Florida and turn over the reigns [sic] of the office.
Id. at 73. Mazzitti subsequently acknowledged that she "could be fired, but there would be payment" if that were to occur. Id. at 90.
 {¶ 33} A careful review of the deposition pages cited by Mazzitti defeats her position that clear and definite promises were made. Indeed, Mazzitti has not offered any evidence of clear and unambiguous promises of job security for herself, but, rather, hinges her claim on representations made by Cohen regarding a future business plan forhimself. Far from being "specific promises of continued employment," the representations upon which Mazzitti relies are precisely the sort of vague and amorphous statements that cannot constitute the basis for a promissory estoppel claim in the employment context. See, e.g., Dahl v.Battelle Memorial Institute, Franklin App. No. 03AP-1028, 2004-Ohio- *Page 19 
3884, at ¶ 23 (citations omitted); Buren v. Karrington Health, Inc.
(Jan. 17, 2002), Franklin App. No. 00AP-1414; Daup v. Tower Cellular,Inc. (2000), 136 Ohio App.3d 555; Anders v. Specialty Chem. Resources,Inc. (1997), 121 Ohio App.3d 348, 351; Condon v. Body, Vickers Daniels (1994), 99 Ohio App.3d 12, 19; Clipson v. Schlessman (1993),89 Ohio App.3d 230, 233; Lake v. Wolff Brothers Supply, Inc. (Nov. 10, 1993), Cuyahoga App. No. 63959; Healey v. Republic Powdered Metals,Inc. (1992), 85 Ohio App.3d 281, 284; Peters v. Mansfield Screw MachineProducts (1991), 73 Ohio App.3d 197, 200. In fact, courts have held that terms such as "long-term," "long haul," and "long run," are not "definite and certain" and, thus, cannot support a claim for promissory estoppel. Premier Tech. Sales, Inc. v. Digital Equip. Corp.
(N.D.Cal.1998), 11 F.Supp.2d 1156, 1163, affirmed in part (C.A.9, 1999), 202 F.3d 279 (citations omitted); see, also, Omega Eng., Inc. v. EastmanKodak Co. (D.Conn.1998), 30 F.Supp.2d 226; Health Plans v. New York LifeIns. Co. (D.Mass.1995), 898 F.Supp. 941.
 {¶ 34} Based on the foregoing, we conclude that Mazzitti's claim founders because a critical element of a promissory estoppel claim, a specific promise, is absent. Thus, we find, as did the trial court, that the representations cited by Mazzitti regarding her future employment with GCG are insufficient to support a promissory estoppel claim in this case. Accordingly, Mazzitti's second assignment of error is overruled.
 {¶ 35} In her third assignment of error, Mazzitti contends that the trial court erred in granting summary judgment in favor of GCG on her claim for an unpaid bonus. We disagree.
 {¶ 36} Mazzitti presents the same arguments on appeal that were before the trial court. Mazzitti argues that GCG was liable "to pay her a bonus for 2004 pursuant to *Page 20 
GCG's agreement to pay her a bonus based upon profitable performance of the company." (Mazzitti brief at 17.) The "agreement" to which Mazzitti refers is the conversation she had with Isaac when he extended her an offer of employment. According to Mazzitti:
 * * * When Isaac made an offer of employment to plaintiff he told her she would have a salary base of $160,000; she would receive a signing bonus of $40,000 — half up front and half in six months and as senior management she would participate in the bonus pool. She was told that the previous year's bonuses had been from a pool of approximately $1.5 million and that the senior management participation was expected to be 3 ½ to 4 ½ percent of the pool. Mazzitti was told by both Isaac and the company's chairman that GCG was in a record year situation and that the parent company was extremely pleased with GCG's performance, and that the bonus situation should be excellent for the year 2004.
(Mazzitti brief at 17-18; Mazzitti memorandum in opposition to GCG's motion for summary judgment, at 18.)
 {¶ 37} As GCG points out, however, the conversation between Mazzitti and Isaac was reduced to writing in the Term Sheet, which was sent to Mazzitti one month before she left Nationwide and almost two months before she began her employment with GCG. Mazzitti testified in her deposition that the Term Sheet accurately reflected the terms of GCG's employment offer, which describes the "bonus" as a "discretionary annual performance incentive payment."
 {¶ 38} In her reply brief, Mazzitti does not respond to GCG's argument that the performance incentive payment provided for in the Term Sheet was discretionary. Rather, she reiterates that in addition to alleging breach of contract, she also seeks recovery under theories of unjust enrichment and quantum meruit. In that regard, the *Page 21 
sum total of Mazzitti's argument is that she "was promised a bonus; her salary was separate from her bonus; and the bonus was a large component of her compensation. [Thus,] [s]he had every reason to anticipate receiving her bonus for services rendered to GCG and it is unjust for GCG to withhold payment." (Mazzitti brief at 20; Mazzitti reply brief at 8; Mazzitti memorandum in opposition to GCG's motion for summary judgment, at 20.)
 {¶ 39} The trial court agreed with GCG's argument that Mazzitti's "claim for an unpaid bonus fails as the Term Sheet headed `Performance Incentive' allows for a `discretionary annual performance incentive program.'" (Trial court decision at 4.) It found the bonus program was discretionary, and further determined that Mazzitti failed to provide "evidence that [GCG] breached any obligations to [Mazzitti] when they chose not to award her an incentive bonus payment." Id.
 {¶ 40} Having reviewed the evidence submitted in support of and in opposition to summary judgment, we agree with the trial court's determination that the bonus to which Mazzitti lays claim is discretionary, and, therefore, she has no legal entitlement to same under any of her alleged theories of recovery.
 {¶ 41} The Term Sheet contains the only written reference to a bonus in the record, and it provides:
 Performance Incentive: A discretionary annual performance incentive payment which will be paid out of the Company's performance incentive fund (comprising 20% of GCG's EBITA earnings using accrual method of accounting).
We find the above language to be clear and unambiguous: at GCG's discretion, Mazzitti could receive an annual performance incentive payment, which would be paid from *Page 22 
GCG's EBITA earnings. There is simply no way to reasonably construe the foregoing as a "guaranteed" bonus. In fact, Mazzitti's own notes, which she took during her conversation with Isaac, essentially reflect that finding. (GCG appendix to brief at A-1) (Mazzitti handwritten notes provide, "+ eligible in bonus pool.")
 {¶ 42} Further, Isaac attests in his affidavit, and as the name of the bonus program itself suggests, an employee's "job performance" is an "important" factor in determining whether that employee should be awarded a bonus (Isaac affidavit at ¶ 5). And, as GCG aptly notes, not only did Mazzitti "not earn a discretionary performance incentive payment, [but] her performance was so deficient and lacking that she was terminated." (GCG brief at 20; Isaac affidavit at ¶ 5 ["Ms. Mazzitti's employment was terminated in early November, before the end of the year, and before any bonuses would be determined. She did not earn a bonus. She was not entitled to a bonus, because she had not performed her job satisfactorily"].)
 {¶ 43} Mazzitti attempts to persuade this court by citing to a string of cases[3] that, she claims, stand for the proposition that Ohio courts "consistently" order payment of commissions and bonuses when an employee completed the services for which he or she would have been compensated had the employer not terminated the employee, or the employee voluntarily terminated his or her own employment, before the commissions or bonuses were due. (Mazzitti brief, at 18.) We do not find any of the cases cited by *Page 23 
Mazzitti convincing, as they are factually distinguishable and do not concern discretionary performance incentives.
 {¶ 44} Rather, we find our opinion in Frank v. Nationwide Mut. Ins.Co., Franklin App. No. 02AP-1336, 2003-Ohio-4684, which was cited by GCG and relied upon by the trial court, to be instructive. In that case, the employee signed an employment release agreement that provided he would be eligible for an incentive payment for the period of time he worked preceding his departure. When the time came for the employer to determine bonuses, it decided that its former employee's job performance did not merit a bonus award. The former employee sued, alleging breach of contract and bad faith. The trial court granted summary judgment in favor of the employer on both of the former employee's claims. As germane to our discussion, the trial court found that the former employee understood the terms of the employment release agreement and admitted that he was not guaranteed a bonus payment, and, thus, he failed to show a breach of contract. This court affirmed that decision, finding the discretionary nature of the bonus to be dispositive.
 {¶ 45} Another case cited by GCG, Grosko v. Dana Commercial CreditCorp. (Sept. 1, 2000), Lucas App. No. L-00-1060, also has applicability here. In that case, the Sixth District Court of Appeals affirmed the trial court's dismissal of the employee's claim for an unpaid discretionary bonus. In reaching its conclusion, the court of appeals explained:
 The contract speaks of appellant's "potential" to receive bonuses; however, it clearly states bonuses are based on DCC's discretion. Although the contract gives historical data regarding the range of past bonuses and mentions factors that influence bonuses, apparently in an effort to attract *Page 24 
appellant as an employee, it does not promise a precise amount or exactly how this amount will be calculated. Therefore, taking all facts as stated in the pleadings as true and construing all inferences in favor of appellant, we find appellant's first assignment of error not well-taken.
Id.
 {¶ 46} Here, similar to the contract in Grosko, the Term Sheet expressly refers to the bonus as being discretionary, it does not provide an exact amount if awarded, nor does it detail how GCG would calculate an employee's performance incentive payment. Further, Isaac's statements to Mazzitti about the previous year's bonus are akin to the employer in Grosko providing "historical data regarding the range of past bonuses to attract [Mazzitti] as an employee." Id. Such statements were not promises of a guaranteed bonus. It is also significant that Mazzitti does not claim that Isaac promised her an exact amount, and we note there is no evidence in the record that would support such a finding.
 {¶ 47} We also find support for the conclusion we have reached in the following cases: Lillien v. Peak6 Invest., L.P., (C.A.7, 2005)417 F.3d 667 (letter discussing bonus described it as discretionary, did not contain an exact amount, nor did it say it was guaranteed); Amant v.Kidde, Inc. (C.A.6, 1985), 756 F.2d 685, 686 (summary judgment properly granted on employee's claim for unpaid bonus because the terms of the bonus incentive plan made the awarding of any bonuses discretionary);UGS Corp. v. Musti (S.D.Ohio 2007), No. 1:06-CV-084 ("a pure performance-based bonus, based upon that employee's personal evaluation by his supervisor is entirely discretionary with the employer, and the ex-employee may not recover that payment"); Davidson v. Deutsche BankSecurities, Inc. (D.Ma. 2005), Civil Action No. 04-11027-RGS;Mirabella v. Turner *Page 25 Broadcasting Systems, Inc. (S.D.N.Y. May 19, 2003), Case No. 01 Civ. 5563 (BSJ) (summary judgment granted where "performance incentives for which plaintiff was eligible were entirely discretionary"); Herbst v.General Accident Ins. Co. (D.Pa.1999), Civil Action No. 97-8085 ("The award of a bonus and indeed the incentive bonus program itself were discretionary and by its terms did not apply to any employee, even if otherwise eligible, who was terminated] prior to distribution");Evely v. Carlon Co. (Feb. 4, 1982), Cuyahoga App. No. 43175 (employer had the discretion to award a bonus, and because no binding bonus agreement was breached, the employee was not legally entitled to a bonus).
 {¶ 48} Based on the above, we conclude that Mazzitti is not entitled to recover on her claim for an unpaid bonus. Accordingly, we overrule Mazzitti's third assignment of error.
 {¶ 49} For these reasons, we conclude that there are no genuine issues of material fact, and that GCG is entitled to judgment as a matter of law. Mazzitti's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT and BROWN, JJ., concur.
[1] GCG, Isaac, and Cohen, are collectively referred to as "GCG" throughout this opinion, unless an individual appellee is specifically referenced.
[2] Mazzitti also cited to three additional pages of transcript testimony in support, but upon review of same, we find those pages just reiterate the content of those portions examined in the body of this opinion.
[3] The cases cited by Mazzitti, in the order they appear in her brief, include: Haines Co., Inc. v. Stewart (Feb. 5, 2001), Stark App. No. 2000CA00138; Wall v. Pizza Outlet, L.P., Stark App. No. 2001CA00376, 2002-Ohio-3483; Seidler v. FKM Adver. Co. (2001), 145 Ohio App.3d 688;Ohio Marble Co. v. Byrd (C.A.6, 1933), 65 F.2d 98; McKelvey v. SpitzerMotor Ctr, Inc. (1988), 46 Ohio App.3d 75; Montgomery Ward Co. v.Smith (Dec. 3, 1931), 12 Ohio Law Abs. 28; Turnipseed v. Bowness (Apr. 23, 1929), 7 Ohio Law Abs. 310; Elbinger Shoe Mfg. Co. v. Patrick
(1921), 14 Ohio App. 456. *Page 1